DAVIDOFF HUTCHER & CITRON LLP
605 Third Avenue
New York, New York 10158
(212) 557-7200
David H. Wander, Esq.
dhw@dhclegal.com
*Attorneys for Counsel Financial II LLC*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X

In re:                                                    Chapter 11

JEFFREY L. LIDDLE,                                        Case No. 19-10747-shl

                          Debtor.
------------------------------------------------------X


## MEMORANDUM OF LAW BY COUNSEL FINANCIAL II LLC
## IN SUPPORT OF ITS PERFECTED SECURITY INTEREST IN AND
## <u>LIEN ON CASH COLLATERAL</u>


Davidoff Hutcher & Citron LLP
605 Third Avenue
New York, NY 10158
212.557.7200
*Attorneys for Counsel Financial II LLC*


<u>Of Counsel</u>
David H. Wander, Esq. (dhw@dhclegal.com)
Michael Wexelbaum, Esq. (mw@dhclegal.com)
Michael D. Katz, Esq. (mk@dhclegal.com)


653626v.1

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS ...................................................................................................... 2

   A.   The Debtor and his law firm ................................................................................. 2

   B.   CF2 Note, Guaranty, and Security Agreement ........................................................ 2

   C.   LIG Note, Guaranty, and Security Agreement........................................................ 4

   D.   CF Holdings Note, Guaranty, and Security Agreement.............................................. 4

   E.   Liddle pledged the sale proceeds from his Manhattan cooperative apartment
      and his houses in the Hamptons as additional collateral.......................................... 5

   F.   Liddle Acknowledges Debt to CF2 and affiliates .................................................... 5

   G.   CF2 sued Liddle in state court after L&R defaulted ............................................... 6

   H.   TRO prevents Liddle from absconding with the Sale Proceeds................................... 6

   I.   Liddle agrees to Stipulation and Order providing for escrow agent to hold
      net sale proceeds of the New York Property pending further order of the court
      in the Lawsuit...................................................................................................... 7

   J.   CF2 granted Summary Judgment and an Order of Attachment ....................................... 8

   K.   Liddle's Chapter 11 petition.................................................................................. 9

   L.   Debtor's motion for use of cash collateral .............................................................. 10

ARGUMENT ........................................................................................................................ 11

POINT CF2'S SECURITY INTEREST IN AND LIEN UPON
THE CASH COLLATERAL WERE PERFECTED WHEN
NARDONE TOOK POSSESSION OF THE SALE PROCEEDS ............................................. 11

   A.   CF2 Has a Perfected Security Interest and Lien
      Under N.Y. U.C.C. § 9-313(a)............................................................................. 11

   B.   CF2 Has a Perfected Security Interest and Lien
      Under N.Y. U.C.C. § 9-313(c)............................................................................. 15

CONCLUSION...................................................................................................................... 17

ii

# TABLE OF AUTHORITIES

## CASES

*Cassirer v. Invex, Ltd. (In re Schick)*, 214 B.R. 13 (Bankr. S.D.N.Y. 1997)................................ 10

*Charnow v. Charnow*, 134 A.D.3d 875, 22 N.Y.S.3d 126 (2d Dep't 2015) ................................ 10

*Five Star Bank v. CNH Capital Am., LLC*, 55 A.D.3d 1279,
    865 N.Y.S.2d 190 (4th Dep't 2008)........................................................................................ 12

*Geron v. Schulman (In re Manshul Constr. Corp.)*, 225 B.R. 41 (Bankr. S.D.N.Y. 1998).......... 10

*Harleysville Worcester Mut. Ins. Co. v. Bank of Am., N.A.*, 370 B.R. 517 (S.D.N.Y. 2007)....... 12

*Hassett v. Blue Cross & Blue Shield of Greater N.Y.*
    *(In re O.P.M. Leasing Servs., Inc.)*, 46 B.R. 661 (Bankr. S.D.N.Y. 1985) ........................ 13, 14

*Heyer v. Conesus Milk Producers Coop. Ass'n, Inc.*
    *(In re Clayson)*, 341 B.R. 137 (Bankr. W.D.N.Y. 2006)........................................................ 16

*In re Copeland*, 531 F.2d 1195 (3d Cir. 1976) .......................................................................... 13

*Norwest Bank St. Paul, N.A. v. Bergquist (In re Rolain)*, 823 F.2d 198 (8th Cir. 1987).............. 15

*Providence, SC. Bank R.I. v. MIXITFORME, Inc.*, No. PM 06-1626, 2007
    WL 299361 (R.I. Super. Ct. Jan. 11, 2007) ............................................................................ 13

*Rosenman & Colin v. Richard (In re Rosenman & Colin)*,
    850 F.2d 57 (2d Cir. 1988)..................................................................................................... 10

*Stockschlaeder & McDonald, Esqs. v. Kittay (In re Stockbridge Funding Corp.)*,
    145 B.R. 797 (Bankr. S.D.N.Y. 1992), *aff'd in part, vacated in part on other grounds*,
    158 B.R. 914 (S.D.N.Y. 1993); *Nichols v. Stewart Title & Trust of Tucson (In re Nichols)*,
    88 B.R. 871 (Bankr. C.D. Ill. 1988)........................................................................................ 14

*Walmart Stores, Inc. v. First Am. Corp.*, No. 11-cv-7185, 2012
    WL 3957184, at *6 (S.D.N.Y. Aug. 30, 2012) ........................................................................ 12

## STATUTES

*11 U.S.C. § 362(a)* ....................................................................................................................... 9

*11 U.S.C. § 363* ............................................................................................................................ 3

*11 U.S.C. §§ 105, 542 and 543* .................................................................................................... 3

N.Y. Jud. Law § 475 .................................................................................................................... 10

N.Y. U.C.C. § 9-102(a)(70) ....................................................................................... 16

N.Y. U.C.C. § 9-310(a) ............................................................................................... 11

N.Y. U.C.C. § 9-312(b)(3) ........................................................................................... 12

N.Y. U.C.C. § 9-313(a) ......................................................................................... passim

N.Y. U.C.C. § 9-313(c) ......................................................................................... passim

N.Y. U.C.C. § 9-313(c)(2) ............................................................................... 1, 15, 16

N.Y. U.C.C. § 9-305 ................................................................................................... 14

iv

Counsel Financial II LLC ("CF2") submits this memorandum of law in support of its perfected security interest in and lien upon the cash collateral that is the subject of the Debtor's motion for use of cash collateral dated April 8, 2019 (the "CC Motion") [Doc 37] and the interim order dated April 15, 2019 granting the motion ("Interim Order") [Doc 52].

## PRELIMINARY STATEMENT

CF2 has a perfected security interest in and lien upon the cash collateral the Debtor has been using and seeks to continue to use. This cash collateral, which totaled $1,090,603 when the funds were first transferred to the Debtor's debtor-in-possession account, is 50% of the proceeds from the sale of the Debtor's New York cooperative apartment. The Debtor claimed a one-half interest in the proceeds of the sale of the cooperative apartment as his property.[1]

CF2's security interest and lien became perfected because it took "possession" of those funds when the money was transferred to the IOLA account of Diane Nardone, Esq. ("Nardone"), who was acting as CF2's escrow agent, pursuant to N.Y. U.C.C. § 9-313(a).

CF2 also has a perfected security interest in and lien upon the cash collateral, pursuant to N.Y. U.C.C. § 9-313(c)(2), because the money was transferred to Nardone, a third party, after she authenticated a record acknowledging she would be holding the funds for the benefit of CF2.

While CF2 has a perfected lien in the cash collateral, the purported secured party, a law firm that defended a foreclosure action, does not.

---

[1] The Debtor claims that the other 50% of the net sale proceeds belongs to his wife, but that issue is not presently before the Court.

1

## STATEMENT OF FACTS

### A.    The Debtor and his law firm

Jeffrey Lew Liddle (the "Debtor") is an attorney in New York and has been a partner in Liddle & Robinson, L.L.P. (the "Firm" or "L&R") since the law firm was formed in 1979. *CC Motion*, ¶ 5.

In 2016 and 2017, Liddle caused L&R to borrow $7.8 million from three affiliates of Counsel Financial Services LLC:[2] CF2, LIG Capital LLC ("LIG"), and Counsel Financial Holdings LLC ("CF Holdings").

### B.    CF2 Note, Guaranty, and Security Agreement

In 2016, L&R obtained a loan of $5,600,000 from CF2 and Liddle executed a Revolving Promissory Note dated August 5, 2016, and Allonges thereto dated August 5, 2016, October 13, 2016, and December 21, 2016 (collectively, the "CF2 Note") on behalf of L&R. *See* Letter dated April 22, 2019 from David H. Wander, Esq. to the Honorable Sean Lane and enclosed documents (the "CF2 Docs") [Doc 55], Exhibit A.

Liddle[3] also executed a Guaranty of Payment and Performance dated August 5, 2016 (the "CF2 Guaranty"), an absolute and unconditional guaranty of L&R's payment and performance under the CF2 Note. *See CF2 Docs*, Ex. B.

Liddle also executed a Security Agreement dated August 5, 2016 (the "CF2 Security Agreement"), both on behalf of L&R and individually, and pledged all of their respective assets to secure L&R's payment and performance under the CF2 Note. *See CF2 Docs*, Ex. C.

---

[2] Counsel Financial is a funder of plaintiffs' law firms throughout the United States and has provided more than $1.5 billion in lines of credit and other financial resources exclusively to plaintiffs' firms nationwide.

[3] Liddle's then partners, Blaine H. Bortnick, James Ryan Hubbard, and Christine A. Palmieri, also guaranteed the CF2 Note.

653626v.1

Pursuant to the CF2 Security Agreement, L&R and Liddle each gave CF2 a security interest in certain collateral, including goods, money, accounts and any other personal property, "and all replacements and substitutions for, and all accessions and additions to, and all profits, offspring, Products and other Proceeds of, all of the foregoing (the "Collateral"):

> All of each Debtor's right, title and interest in all Goods (including, Equipment, Fixtures and Inventory), Money, Instruments (including Promissory Notes), Accounts, Deposit Accounts, Chattel Paper, Investment Property, Letter-of-Credit Rights, Documents and General Intangibles (including payment intangibles), Commercial Tort Claims described in the Questionnaire, Insurance Proceeds and any other personal property (whether or not subject to the UCC), and all interest, dividends and other distributions thereon paid and payable in cash or in property; and all replacements and substitutions for, and all accessions and additions to, and all profits, offspring, Products and other Proceeds of, all of the foregoing.

*Id.*

On July 25, 2016, CF2 filed a UCC-1 Financing Statement for L&R's collateral under the CF2 Security Agreement. *See CF2 Docs*, Ex. D.  On August 11, 2016, CF2 filed a UCC-1 Financing Statement for Liddle's collateral under the CF2 Security Agreement. *See CF2 Docs*, Ex. E.

As set forth in the Affidavit of Paul Cody dated December 17, 2018 (the "Cody Aff."), L&R pledge a significant amount of collateral to cover the loan:

> When the loan documents were signed, Liddle represented to CF2, and due diligence performed by CF2 confirmed, that the Firm had tens of millions of dollars in … contingency fee cases, and between $140,000 to $200,000 monthly income from its hourly fee practice.

*See Response by Counsel Financial II LLC to Debtor's Motion (I) under 11 U.S.C. §§ 105,542 and 543 For Turnover of Property by Escrow Agent or Custodian; and (II) Under 11 U.S.C. § 363 For Use of Cash Collateral* [Doc 24], at Exhibit I.

3

C.    **LIG Note, Guaranty, and Security Agreement**

L&R also borrowed $1,500,000, in 2016, from LIG (the "LIG Loan") and Liddle executed a Term Promissory Note dated October 13, 2016 (the "LIG Note") on behalf of L&R. *See CF2 Docs*, Ex. F.

Liddle also executed a Guaranty of Payment and Performance dated October 13, 2016 (the "LIG Guaranty"), an absolute and unconditional guaranty of L&R's payment and performance under the LIG Note. *See CF2 Docs*, Ex. G.

L&R and Liddle also entered into a Security Agreement with LIG (the "LIG Security Agreement") and pledged all of their respective assets to secure L&R's payment and performance under the LIG Note (the "LIG Security Agreement"). *See CF2 Docs*, Ex. H. The LIG Security Agreement contains the same definition of "Collateral" as in the CF2 Security Agreement.

On October 14, 2016, LIG filed a UCC-1 Financing Statement relating to the LIG Security Agreement and collateral of Liddle and L&R. *See CF2 Docs*, Ex. I.

D.    **CF Holdings Note, Guaranty, and Security Agreement**

Finally, L&R borrowed $1,000,000, in 2017, from CF Holdings and Liddle executed a Revolving Promissory Note dated June 2, 2017 (the "CF Holdings Note") on behalf of L&R. *See CF2 Docs*, Ex. J.

Liddle also executed a Guaranty of Payment and Performance dated June 2, 2017 (the "CF Holdings Guaranty"), an absolute and unconditional guaranty of L&R's obligations under the CF Holdings Note. *See CF2 Docs*, Ex. K.

L&R and Liddle entered into a Security Agreement dated June 2, 2017 (the "CF Holdings Security Agreement"), pledging all of their respective assets to secure L&R's payment and

4

performance under the CF Holdings Note. *See CF2 Docs*, Ex. L. The CF Holdings Security

Agreement also contains the same definition of "Collateral" as in the CF2 Security Agreement.

On June 2, 2017, CF Holdings filed a UCC-1 Financing Statement relating to the CF

Holdings Security Agreement and collateral of L&R and Liddle. *See CF2 Docs*, Ex. M.

**E.      Liddle pledged the sale proceeds from his Manhattan
cooperative apartment and his houses in the Hamptons
as additional collateral**

When Liddle obtained the CF Holdings Loan, he also pledged the proceeds from a sale of

his cooperative apartment located at 11 Fifth Avenue, Unit 19M/N, New York, New York (the

"New York Property") and his houses located at 560 Main Street and 554 Main Street, Quiogue,

New York  (the "Hamptons Houses") as additional collateral.[4]

Section 2(b)(i) of the CF Holdings Note provides:

> … [Liddle] hereby agrees that upon the sale of the Hamptons
> Property and/or New York Property, applicable sale proceeds will
> be used to pay off all indebtedness of [L&R] as follows: first, to
> payoff [sic] the indebtedness owing to [LIG], second to payoff
> [sic] the indebtedness owing to [CF Holdings], and third any
> remaining proceeds shall be used to reduce the principal amount
> owed to [CF2]….

*CF2 Docs*, Ex. J at § 2(b)(i).

**F.      Liddle acknowledges debt to CF2 and affiliates**

On January 22, 2018, Liddle acknowledged the debts owed to CF2, LIG, and CF

Holdings in the aggregate amount of $7,791,448.08, which was memorialized in a Stipulation

executed by Liddle both individually and on behalf of L&R. *Cody Aff.*, at ¶ 23; *Cody Aff.*, Ex. C.

---

[4] Liddle gave his personal financial statement as of July 25, 2016 to CF2, valuing the New York Property at $8.5
million subject to a mortgage of $1,650,000, and a HELOC of $1,800,000, for a total of $3,450,000. He also valued
the Hamptons Property at $6.8 million subject to a $2,659,000 mortgage.

653626v.1

G.    **CF2 sued L&R and Liddle in state court after L&R defaulted**

Liddle has a history of unfulfilled promises to CF2 about making payments on account of the CF2 Note but not delivering. *See* Cody Aff., ¶ 30. In the spring of 2018, counsel for Liddle and L&R informed CF2 that the firm could not pay off the CF2 Note. *Id.*

On September 18, 2018, CF2 filed a motion for summary judgment in lieu of complaint against L&R and Liddle, in the Supreme Court of the State of New York, Erie County, captioned *Counsel Financial II LLC v. Liddle & Robinson LLP, Jeffrey L. Liddle, Blaine H. Bortnick, and James Ryan Hubbard*, Index. No. 814703/2018 (the "Lawsuit").[5]

H.    **The TRO prevents Liddle from absconding with the sale proceeds**

On numerous occasions, Liddle promised to sell the New York Property and his Hamptons Houses to pay off the loans to CF2 and its affiliates. Liddle had given CF2 a personal financial statement showing many millions of dollars of equity in each of these properties. *Cody Aff,* Exhibit R, at p.2.

CF2 discovered that Liddle listed the New York Property and the Hampton Houses for sale and that he had no intention of using any portion of the sale proceeds to pay CF2 or its affiliates. *Cody* Aff., at ¶¶ 62, 72-73.

To prevent Liddle from absconding with the sale proceeds, CF2 sought a temporary restraining order and an order of attachment. *See CF2 Docs*, Ex. P; Cody Aff., ¶¶ 1, 76. On December 19, 2018, a temporary restraining order was issued in the Lawsuit, restraining Liddle from transferring, dissipating, or otherwise disposing of the proceeds of any sale of the New York Property or the Hamptons Houses:[6]

---

[5] CF2 also sued the other guarantors of the CF2 Note.

[6] On January 2, 2019, CF2 filed a UCC-1 Financing Statement covering the TRO. *See CF2 Docs*, Ex. O.

6

> [P]ending a hearing and determination on the Motion, defendant
> Jeffrey Liddle, his designees or any person or entity acting on
> his behalf, are hereby restrained and prohibited from transferring,
> dissipating, or otherwise disposing of any proceeds of any sales of
> Mr. Liddle's residential real properties located at 560 Main Street
> and 554 Main Street, Quiogue, New York and 11 Fifth Avenue,
> Apts. 19M and 19N, New York, New York (the "New York
> Property"), which funds shall be held in escrow by Mr. Liddle
> pending the determination of this Motion.

*See CF2 Docs*, Ex. N. On January 4, 2019, another temporary restraining order was entered in

the Lawsuit, granting CF2 an extension of time to serve Liddle, who was intentionally avoiding

service. *See CF2 Docs*, Ex. P.

I.    **Liddle agrees to Stipulation and Order providing for escrow
      agent to hold net sale proceeds of the New York Property
      <u>pending further order of the court in the Lawsuit</u>**

Liddle wanted to close on a contract of sale of the New York Property for $6.6 million

and, therefore, he entered into a Stipulation and Order with CF2 dated February 1, 2019 (the

"<u>Escrow Stipulation</u>"), whereby he agreed that the full amount of the net sale proceeds[7] would be

held in escrow by Nardone, the attorney for Liddle and his wife handling the closing. *See CF2*

*Docs*, Ex. Q.

Specifically, both Liddle <u>and</u> Nardone agreed that Nardone would hold the net sale

proceeds, in escrow, subject to the TRO, CF2's motion for an order of attachment, and a further

order of the court:

> … the net proceeds of sale (i.e., the sales price of $6,600,000.00
> less the eleven authorized payments listed in Paragraph 2 hereof)
> shall be held in escrow by Diane C. Nardone, Esq. ("Nardone"),
> the closing attorney for Liddle and Tara Liddle on the sale of the
> Apartment, in her Attorney IOLA Account, subject to the TRO
> pending the hearing and determination of Plaintiff's motion for an

---

[7] The Stipulation provided for eleven (11) approved payments, including payoffs for the mortgage, broker's
commission, etc.

653626v.1

order of attachment and a further order of this Court disposing of
that motion for an order of attachment.

*Id.*

Among other things, the Escrow Stipulation contained several notice provisions,
requiring Nardone to give notice to CF2's attorneys of the closing date of the sale and Nardone's
receipt of the net sale proceeds, as escrow agent:

> Nardone shall <u>notify Larry Hutcher, Esq. and Michael Wexelbaum,
> Esq. of Davidoff Hutcher & Citron LLP</u>, via email, of the date of
> closing the day prior thereto.
>                 *           *           *
> Upon the closing of the sale of the Apartment, Nardone shall
> promptly, and no later than two business days after the closing,
> <u>notify Plaintiff's attorneys, Davidoff Hutcher & Citron LLP</u>, of the
> amount of the net proceeds of sale that she is holding in escrow
> and provide proof of payment of the eleven payments authorized to
> be made in accordance herewith.

Escrow Stipulation at ¶¶ 4-5 (emphasis added).

The sale of the New York Property closed on February 7, 2019 and, thereafter, the net
sale proceeds of $2,181,207.77 (the "<u>Sale Proceeds</u>") was transferred to Nardone's IOLA
account.

**J.    <u>CF2 granted Summary Judgment and an Order of Attachment</u>**

On February 11, 2019, at the conclusion of a hearing in the Lawsuit, which was attended
by Liddle, [8] the court granted CF2's motion for summary judgment in lieu of complaint along
with its motion for an order of attachment. *See CF2 Docs*, Ex. R.

Notwithstanding the court's ruling, in a letter to the court before any order was entered,
Nardone stated her intention to transfer 50% of the funds she was holding in escrow to Tara
Liddle, the Debtor's wife, and $150,000 to Liddle for his "homestead exemption." *Declaration*

---

[8] At the hearing, Liddle represented L&R and, also, himself *pro se.*

8

of *Jeffrey L. Liddle in Support of Debtor's Motion for Use of Cash Collateral dated April 8, 2019*
[Doc 37-1], at ¶ 11.  In response, Supreme Court Justice Deborah A. Chimes sent Nardone a
letter dated February 27, 2019 instructing her "not to make any distribution until further
notification from this Court." *See CF2 Docs*, Ex. S.

On March 7, 2019, the state court entered an Order of Attachment (the "Attachment
Order") covering the entirety of the Sale Proceeds.[9]  *See CF2 Docs*, Ex. T.

## K.    Liddle's Chapter 11 petition

On March 11, 2019, Liddle filed his chapter 11 petition (the "Chapter 11 Petition") and,
pursuant to § 362(a) of title 11 of the United States Code (the "Bankruptcy Code"), the Lawsuit
was automatically stayed, along with Nardone's obligation to deposit the Sale Proceeds with the
state court's registry.

Liddle listed CF2 as having an undisputed, secured claim of $6,546,448.83[10] and a lien
on the Sale Proceeds.  *See Petition, Schedule D* [Doc 1], page 11 of 31.

Liddle also listed White & Wolnerman ("W&W") as having an unsecured claim of
$46,893 for legal fees.[11]  *See Petition, List of 20 Largest Unsecured Creditors* [Doc 1, page 17 of
31].

---

[9] Although CF2 consented to Tara Liddle's intervention in the Lawsuit and the court invited her attorney, Arnold
Reiter, Esq. ("Reiter"), to intervene in the Lawsuit to assert Tara Liddle's claim, Reiter tried to circumvent the court
orders by commencing an action in the Supreme Court, New York County, against Nardone, seeking to relieve
Nardone from the restraints imposed upon her, as escrow agent in the Lawsuit.  That caused the court to order
Nardone to transfer the Sale Proceeds to the court registry.

[10] The Debtor also listed CF2, in his list of creditors who have the 20 largest unsecured claims, as his largest
unsecured creditor, with a contingent, disputed unsecured claim of $6,546,448.83, and the nature of this claim was
listed as "Guarantor Obligation."  The Debtor also listed CF Holdings as having a disputed, unsecured claim of
$1,906,621, and LIG as having a disputed, unsecured claim of $634,910.04.

[11] Notably, the Debtor checked the "no" box on the form for the question as to whether W&W has a lien on any of
the Debtor's property.

9

**L.**    **Debtor's motion for use of cash collateral**

On April 8, 2019, the Debtor filed a motion for use of cash collateral consisting of the

Debtor's claimed 50% interest in the Sale Proceeds totaling $1,090,603.86 (the "Cash

Collateral"), pursuant to § 363 of the Bankruptcy Code (the "CC Motion") [Doc 37].

The Debtor took the position that CF2 had no security interest in or lien upon the Cash

Collateral, but that W&W did. *CC Motion*, at 26-37. According to the Debtor, W&W had a

charging lien of $46,893 under N.Y. Jud. Law § 475. *CC Motion,* at ¶¶ 38-9.[12]

The Court approved the CC Motion and budgets for both the Debtor personally and for

L&R, on an interim basis, while preserving the rights of all parties, and the Interim Order was

entered. Thereafter, as required by the Interim Order, CF2 filed a letter to the Court dated April

22, 2019, disclosing the documentation concerning CF2's claim to a security interest in and lien

upon the Cash Collateral. Doc 55.

---

[12] Other than the bare reference to New York's Judicary Law § 475, the Debtor failed to provide any facts or case law showing how W&W could possibly have a charging lien. *See Geron v. Schulman (In re Manshul Constr. Corp.),* 225 B.R. 41 (Bankr. S.D.N.Y. 1998) (holding that there is "considerable authority" under New York law that a "defendant's attorney cannot obtain a charging lien unless there is a counterclaim"); *Cassirer v. Invex, Ltd. (In re Schick),* 214 B.R. 13, 15 (Bankr. S.D.N.Y. 1997) (under New York law, a "defendant's attorney cannot obtain a charging lien unless his client asserts a counterclaim"). Moreover, even if there is a counterclaim, there must be a recovery of funds or proceeds greater than the assets already held by the defendant. Here, all that W&W claims is that its representation of Debtor and his wife resulted in them having to pay less to satisfy the HELOC granted to them by Signature Bank. *CC Motion,* ¶ 38. That is not sufficient. *See Charnow v. Charnow,* 134 A.D.3d 875, 876, 22 N.Y.S.3d 126, 127-28 (2d Dep't 2015) ("However, where the attorney's services do not create any proceeds, but consist solely of defending a title or interest already held by the client, there is no lien on that title or interest.") (internal quotation marks and citation omitted); *Rosenman & Colin v. Richard (In re Rosenman & Colin),* 850 F.2d 57, 63 (2d Cir. 1988) ("That the judgment gave to Richard two sculptures and some money does not mean that she obtained 'a judgment in her favor.' N.Y.Jud.Law § 475. Rather, she merely retained what she was undisputedly entitled to before the litigation began, which was considerably less than what she claimed she was entitled to. Rosenman's litigation efforts in this regard did not create any assets to which an attorney's charging lien could attach.").

10

**ARGUMENT**

**POINT**

**CF2'S SECURITY INTEREST IN AND LIEN UPON THE CASH
COLLATERAL WERE PERFECTED WHEN NARDONE TOOK
POSSESSION OF THE SALE PROCEEDS**

When Nardone took possession of the Sale Proceeds, CF2's security interest in and lien

upon the Cash Collateral became perfected under applicable state law.  Specifically, under N.Y.

U.C.C. § 9-313(a), CF2's security interest and lien were perfected when Nardone took

"possession" of the Sale Proceeds as CF2's escrow agent.

Additionally, when Nardone, a third party, took possession of the Sale Proceeds after

executing the Escrow Stipulation, CF2's security interest and lien were perfected under N.Y.

U.C.C. § 9-313(c).

**A.     CF2 Has a Perfected Security Interest and Lien
Under N.Y. U.C.C. § 9-313(a)**

Nardone was acting as CF2's escrow agent and, as such, all the criteria for perfection

under N.Y. U.C.C. § 9-313(a) were met.  The fact that Nardone may have been acting as escrow

agent for both the Debtor and CF2 does not undercut CF2's possession of the money for

purposes of perfection under the statute.

There can be no issue that the Debtor granted CF2 a security interest in his property,

pursuant to the CF2 Security Agreement, and that this collateral included money, along with

numerous other categories of property, both tangible and intangible, and all other personal

property of the Debtor, together with all replacements, substitutions, accessions, additions,

profits, products and other proceeds of all of the foregoing.

Generally, a filed financing statement is all that is needed to perfect a security interest in

a debtor's property.  *See* N.Y. U.C.C. § 9-310(a); *Five Star Bank v. CNH Capital Am., LLC*, 55

11

A.D.3d 1279, 1280, 865 N.Y.S.2d 190, 192 (4th Dep't 2008) ("NGB perfected its security interest by filing financing statements."); *Harleysville Worcester Mut. Ins. Co. v. Bank of Am., N.A.*, 370 B.R. 517, 521 n.4 (S.D.N.Y. 2007) ("It is undisputed that the Agent perfected the Bank Group's security interests by filing the financing statements as required under the Uniform Commercial Code."); *Walmart Stores, Inc. v. First Am. Corp.*, No. 11-cv-7185, 2012 WL 3957184, at *6 (S.D.N.Y. Aug. 30, 2012) ("Accordingly, by executing the Agreement and properly filing the Financing Statements, FGI created, attached, and perfected its security interest in the Walmart account payable to Magla."). Here, there should be no issue that CF2 properly filed the requisite financing statement(s).

Money is treated differently and requires possession for a security interest to be perfected. *See* N.Y. U.C.C. § 9-312(b)(3) ("... a security interest in <u>money</u> may be perfected only by the secured party's taking of possession under Section 9-313." N.Y. U.C.C. § 9-312(b)(3) (emphasis added).

Similarly, N.Y. U.C.C. § 9-313(a) provides that "...a secured party may perfect a security interest in tangible negotiable documents, goods, instruments, <u>money</u>, or tangible chattel paper by taking possession of the collateral." N.Y. U.C.C. § 9-313(a) (emphasis added).

Although "possession" is not defined in § 9-313, the Official Comment to this section shows that the term includes an agency relationship and, in particular, an escrow arrangement whereby the escrowee is deemed the agent for both the secured party and the debtor:

> This section does not define "possession." It adopts the general concept as it developed under former Article 9. As under former Article 9, in determining whether a particular person has possession, the principles of agency apply.... Sometimes a person holds collateral both as an agent of the secured party and as an agent of the debtor. The fact of dual agency is not of itself inconsistent with the secured party's having taken possession (and thereby having rendered subsection (c) inapplicable).... *In a*

12

653626v.1

> *typical escrow arrangement, where the escrowee has possession of*
> *collateral as agent for both the secured party and the debtor, the*
> *debtor's relationship to the escrowee is not such as to constitute*
> *retention of possession by the debtor.*

N.Y. U.C.C. § 9-313, Off. Cmt. 3 (emphasis added).

Accordingly, the perfection requirements of N.Y. U.C.C. § 9-313(a) are met where

property is transferred to an escrow agent, who acts as an agent for both the secured party and

the debtor. *See Hassett v. Blue Cross & Blue Shield of Greater N.Y. (In re O.P.M. Leasing*

*Servs., Inc.)*, 46 B.R. 661, 670 (Bankr. S.D.N.Y. 1985); *In re Copeland*, 531 F.2d 1195, 1204 (3d

Cir. 1976); *Providence, SC. Bank R.I. v. MIXITFORME, Inc.*, No. PM 06-1626, 2007 WL

299361 (R.I. Super. Ct. Jan. 11, 2007).

In *Hassett*, Judge Lifland noted "[t]he rationale underlying perfection by possession is

that 'the debtor's lack of possession coupled with actual possession by the creditor, the creditor's

agent or the bailee serves to provide notice to prospective third party creditors that the debtor no

longer has unfettered use of his collateral." *Hassett*, 46 B.R. at 670 (internal quotation marks and

citations omitted). There, the court concluded that:

> As the Escrow Agent was fully informed of [the secured creditor's]
> interest in the escrow account, and because the escrow
> agreement provided adequate notice to any subsequent creditors of [the
> debtor] that [the debtor] no longer had unfettered use of the funds
> in the escrow account, the Court is satisfied that delivery of
> possession to the Escrow Agent as custodian fully satisfied the
> perfection requirements of the U.C.C.

*Id. See also In re Copeland*, 531 F.2d at 1204 ("possession by a third party bailee, who is not

controlled by the debtor, which adequately informs potential lenders of the possible existence of

a perfected security interest satisfies the notice function underlying the 'bailee with notice'

13

provision of § 9-305.");[13] *Stockschlaeder & McDonald, Esqs. v. Kittay (In re Stockbridge Funding Corp.)*, 145 B.R. 797, 808 n.26 (Bankr. S.D.N.Y. 1992) ("Delivery of possession to an escrow agent satisfies the perfection requirements of U.C.C. 9-305."), *aff'd in part, vacated in part on other grounds*, 158 B.R. 914 (S.D.N.Y. 1993); *Nichols v. Stewart Title & Trust of Tucson (In re Nichols)*, 88 B.R. 871, 876 (Bankr. C.D. Ill. 1988) (holding escrow agent satisfied the perfection requirements of former Section 9-305 of the Uniform Commercial Code where possession of the note by the escrow agent served to "adequately notify prospective creditors that the Debtor no longer had unfettered use of the funds in the escrow account" and the "escrow arrangement protected the reliance interests of third parties dealing with the Debtor").

In the present case, no reasonable third party, in deciding to loan money to Liddle, would rely on the availability of the Cash Collateral, in the hands of Nardone, to secure Liddle's future obligations. The Cash Collateral was not in Liddle's possession and could not be distributed to him, from Nardone's IOLA Account, until the "hearing and determination of [CF2's] motion for an order of attachment and a further order of [the] Court disposing of that motion." *See CF2 Docs,* Ex. Q.

The transfer of the Sale Proceeds to Nardone's IOLA account clearly provided "notice to prospective third party creditors that the debtor no longer has unfettered use" of the Cash Collateral." *Hassett*, 46 B.R. at 670.

The result is no different if the escrow agent acts for both the debtor and secured creditor. N.Y. U.C.C. § 9-313, Off. Cmt. 3; *see e.g. Hassett, supra;*[14]*Norwest Bank St. Paul, N.A. v.*

---

[13] N.Y. U.C.C. § 9-313 was formerly Section 9-305.

[14] In *Hassett*, the debtor deposited the relevant money with its lawyers to be held in escrow as security for performance under a lease. *Hassett*, 46 B.R. at 664. The court found that the debtor's lawyers were a valid escrow agent and bailee and that delivery to them of the relevant funds "fully satisfied the perfection requirements of the U.C.C." *Id.* at 670.

14

*Bergquist (In re Rolain)*, 823 F.2d 198, 200 (8th Cir. 1987).[15] Here, with Liddle's written

consent, Nardone assumed the role as escrow agent for both parties.

Accordingly, CF2 has a perfected security interest in and lien upon the Cash Collateral

under N.Y. U.C.C. § 9-313(a).

## B.    CF2 Has a Perfected Security Interest and Lien Under N.Y. U.C.C. § 9-313(c) (2)

Alternatively, CF2 has a perfected security interest and lien under N.Y. U.C.C. § 9-

313(c)(2) because Nardone received the Sale Proceeds, as a third party, after she executed the

Escrow Stipulation stating that she would hold the money CF2 pending further order of the court.

Liddle was a party to the Escrow Stipulation and consented to all of its terms and conditions.

Therefore, all of the criteria for perfection under N.Y. U.C.C. § 9-313(c)(2) have been met.

The statute provides:

> Collateral in possession of person other than debtor. With
> respect to collateral other than certificated securities and goods
> covered by a document, a secured party takes possession of
> collateral in the possession of a person other than the debtor, the
> secured party, or a lessee of the collateral from the debtor in the
> ordinary course of the debtor's business, when:
>
> > (1) the person in possession authenticates a record
> > acknowledging that it holds possession of the collateral for
> > the secured party's benefit; or

---

[15] In *Bergquist*, the Eighth Circuit, in commenting on *Hassett*, held that because the "debtor's attorneys had their client's consent and were acting as a fiduciary to the secured creditor, they were bound by the terms of the escrow agreement." *Bergquist*, 823 F.2d at 200. The Court of Appeals stated:

> The same may be said here. With Rolain's consent, Mannikko signed an agency
> agreement, promising to act as Norwest's agent in holding the note and perfecting
> Norwest's security interests. He acted as a fiduciary to Norwest, was bound to respect the
> agency, and did so.

*Id.*

15

> (2) the person takes possession of the collateral after having authenticated a record acknowledging that it will hold possession of collateral for the secured party's benefit."

N.Y. U.C.C. § 9-313(c).

Thus, the perfection requirements of N.Y. U.C.C. § 9-313(c)(2) are met where the collateral is in the possession of a third party who "takes possession of the collateral after having authenticated a record acknowledging that it will hold possession of [the] collateral for the secured party's benefit." N.Y. U.C.C. § 9-313(c)(2); *see Heyer v. Conesus Milk Producers Coop. Ass'n, Inc. (In re Clayson)*, 341 B.R. 137, 138-40 (Bankr. W.D.N.Y. 2006).

There can be no issue that Nardone, who was not involved in the Lawsuit when it was filed, was a "third party" vis-à-vis CF2, the lender-plaintiff, and Liddle, the borrower-defendant. Moreover, there can be no issue that Nardone took possession of the Cash Collateral after having executed the Escrow Stipulation. Furthermore, there can be no issue that Nardone acknowledged she would be holding the Cash Collateral for CF2's benefit.

The Escrow Stipulation, undoubtedly, is a "record" for purposes of N.Y. U.C.C. § 9-313(c). The term "record" has a very expansive definition -- "information that is inscribed on a tangible medium or which is stored in an electronic or other medium and is retrievable in perceivable form" – so that it must include the Escrow Stipulation. *See* N.Y. U.C.C. § 9-102(a)(70); *see e.g., In re Clayson*, 341 B.R. at 140 (paper on which a check was written constituted a "record").

Similarly, it cannot be disputed that Nardone "authenticated" the Escrow Stipulation because the term also has a very expansive definition: "(A) to sign; or (B) with present intent to adopt or accept a record, to attach to or logically associate with the record an electronic sound, symbol, or process." N.Y. U.C.C. § 9-102(a)(7).

16

Finally, the express language of the Escrow Stipulation clearly shows that Nardone was holding the Cash Collateral for CF2's benefit.

Accordingly, CF2 has a perfected security interest in and lien upon the Cash Collateral under N.Y. U.C.C. § 9-313(c).

## **CONCLUSION**

The facts underlying CF2's secured status with respect to the Cash Collateral cannot be disputed. The legal principles are fairly simple and straight forward. CF2 took "possession" of the Sale Proceeds through Nardone, its escrow agent. Nardone, a third party, also authenticated a record, prior to receiving the Sale Proceeds, that she would hold the money for the benefit of CF2.

Accordingly, CF2 has a perfected security interest in and lien upon the cash collateral, pursuant to both N.Y. U.C.C. § 9-313(a) and (c).

Dated:  New York, New York
        May 10, 2019

DAVIDOFF HUTCHER & CITRON LLP


By: /s/ David H. Wander
    David H. Wander, Esq.
605 Third Avenue
New York, New York 10158
(212) 557-7200
dhw@dhclegal.com

*Attorneys for Counsel Financial II LLC*

17

653626v.1