DAVIDOFF HUTCHER & CITRON LLP

605 Third Avenue

New York, New York 10158

(212) 557-7200

David H. Wander, Esq.  dhw@dhclegal.com

Alex R. Tiktin, Esq. art@dhclegal.com

*Attorneys for Counsel Financial II LLC, LIG Capital LLC, and Counsel Financial Holdings LLC*

**Hearing Date and Time**

December 19, 2019 at 11:00 a.m.

**Objection Deadline**

December 12, 2019

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X

In re:                                                                  Chapter 11

JEFFREY L. LIDDLE,                                       Case No. 19-10747-shl

                                 Debtor.

-------------------------------------------------------X

# MOTION BY COUNSEL FINANCIAL II LLC, LIG CAPITAL LLC, AND COUNSEL FINANCIAL HOLDINGS LLC, PURSUANT TO § 1112(b) OF THE BANKRUPTCY CODE, TO CONVERT THIS CHAPTER 11 <u>REORGANIZATION TO A CHAPTER 7 LIQUIDATION</u>

# Table of Contents

PRELIMINARY STATEMENT ................................................................................................. 1

JURISDICTION AND VENUE ................................................................................................ 2

STATEMENT OF FACTS ........................................................................................................ 2

    1.   Liddle's chapter 11 case ........................................................................................... 2

    2.   The Debtor's law firm................................................................................................ 3

    3.   Liddle's lavish lifestyle drained the Firm and all of his partners left ................................. 3

    4.   L&R is evicted and Liddle stops paying taxes and maintaining the Firm's books and records .................................................................................................................. 4

    5.   L&R files for bankruptcy protection........................................................................... 5

    6.   Debtor's pre-petition sale of the Fifth Avenue Co-op and frivolous homestead claim ...... 5

    7.   Debtor's Hamptons mansion.................................................................................... 6

    8.   Debtor Transfers Personal Property to Family Members .............................................. 7

    9.   Debtor's Liabilities ................................................................................................. 8

    10.  Huge, Ongoing Losses of the Estate........................................................................ 11

DEBTOR'S CHAPTER 11 REORGANIZATION SHOULD BE CONVERTED TO CHAPTER 7, PURUSUANT TO §1112(b) OF THE BANKRUPTCY CODE, BECAUSE THERE HAS BEEN SUBSTANTIAL DIMINUTION OF THE ESTATE AND THERE IS NO REASONABLE LIKELIHOOD OF REHABILITATION .......................................................... 13

    1.   Substantial and continuing losses ............................................................................ 14

    2.   There is no reasonable likelihood of rehabilitation...................................................... 15

CONCLUSION..................................................................................................................... 17

i

# TABLE OF AUTHORITIES

## THE BANKRUPTY CODE, 11 U.S.C. et. seq.

§ 1112(b) ........................................................................................................ 3, 18

§105(a) ............................................................................................................... 6

## FEDERAL RULES OF BANKRUPTCY PROCEDURE

Bankruptcy Rule 1007-2 .................................................................................. 5

Bankruptcy Rule 2004 ..................................................................................... 6

## CASES

In re C-TC 9th Ave. Partnership,
   113 F.3d 1304 (2d Cir. 1997) ..................................................................... 7

In re Hagerstown Fiber Ltd. Partnership,
   226 B.R. 353 (Bankr. S.D.N.Y. 1998) ........................................................ 7

In re Adbrite Corp.
   290 B.R. 209, 215 (Bankr. S.D.N.Y. 2003) .............................................. 18

In re BHS & B Holdings LLC,
   439 B.R. 342, 347 (Bankr. S.D.N.Y. 2010) .............................................. 18

In re Sillerman,
   2019 WL 5061177, *19 (Bankr. S.D.N.Y. Oct. 8, 2019) ......................... 18

In re Kanterman,
   88 B.R. 26, 29 (S.D.N.Y. 1988) ................................................................ 19

Matter of Denrose Diamond,
   49 B.R. 754, 757 (Bankr. S.D.N.Y. 1985) ................................................ 19

TO THE HONORABLE SEAN H. LANE,
UNITED STATES BANKRUPTCY JUDGE:

Counsel Financial II LLC ("CF2"), LIG Capital LLC ("LIG"), and Counsel Financial Holdings LLC ("Holdings" and together with CF2 and LIG, "Counsel Financial" or "Movant"), by their attorneys, Davidoff Hutcher & Citron LLP, submit this motion, pursuant to § 1112(b) of the Bankruptcy Code, to convert this chapter 11 reorganization to a chapter 7 liquidation and represent and state as follows:

## PRELIMINARY STATEMENT

1.      The Debtor's estate has suffered huge, ongoing losses, since the Petition Date and there is no end in sight.  These losses exceed One Million Dollars including expenses in excess of the Debtor's income (approximately $150,000 through October) and professional fees (in excess of $850,000 through November).

2.      The Debtor's monthly operating reports mask these huge, ongoing losses because the income and expenses of the Debtor's law firm have been comingled into the Debtor's DIP account.  It is impossible to review the Debtor's bank records and know what expenses are personal or for the law firm.

3.      Additionally, the Debtor's accountants have recorded $2.2 million in pre-petition sale proceeds as "cash receipts" and approximately $1.1 million in transfers to the Debtor's spouse have been recorded as "expenses," thereby manufacturing $1.1 million in phantom income.

4.      Thus, only by depleting the co-op sale proceeds has the Debtor been able to survive this long in chapter 11.

5.      There is no likelihood of rehabilitation in this case.  The Debtor will have no cash or unencumbered property to fund a plan.  The Debtor's ongoing losses and accrued professional

fees will exhaust the Debtor's co-op sale proceeds and soon whatever equity remains in the Debtor's real property in the Hamptons will be lost. With no money, no unencumbered property, and his law firm in bankruptcy, the likelihood of rehabilitation in this case is about zero.

6.      There are no unusual circumstances that the Debtor can establish whereby remaining in chapter 11 is in the best interests of creditors and the estate, nor can the Debtor establish there is a reasonable likelihood that a plan will be confirmed soon.

7.      Thus, this case should be converted to chapter 7 and a trustee appointed to administer this estate.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. §157(b)(2).

9.      Venue in this Court is proper pursuant to 28 U.S.C. §§1408 and 1409.

## STATEMENT OF FACTS

### 1.  Liddle's chapter 11 case

10.      On March 11, 2019 ("Petition Date"), Jeffrey Lew Liddle ("Liddle" or "Debtor") filed a voluntary chapter 11 petition for reorganization, *Doc. 1*,[1] and thereafter has remained in possession of his property as a debtor-in-possession.

11.      A creditors committee has not been formed in this case.

12.      The Debtor's exclusive period to file a plan has been extended to January 6, 2020. *See Doc 216.*

13.      The Debtor has not requested a bar date for filing proofs of claim.

---

[1] Unless otherwise specified, references to Doc. and Claim refer to documents filed on the docket or claims filed on the claims register in this case, ECF Case No. 19-10747-shl.

## 2. **The Debtor's law firm**

14.    The Debtor is a practicing attorney and the sole remaining partner of Liddle & Robinson, L.L.P. ("L&R" or "Firm"), a New York limited liability partnership, located in Manhattan.

15.    Since the last partner, other than Liddle, withdrew in January of 2019, the Firm has been in dissolution, as required by applicable New York law. *See In re Liddle & Robinson, LLP,* Case no. 19-12346-shl, Doc. No. 136.

16.    Liddle, however, has made no effort to wind down the Firm.

## 3. **Liddle's lavish lifestyle drained the Firm and all of his partners left**

17.    Liddle founded L&R as the managing partner approximately forty (40) years ago. James R. Hubbard, Esq., a former partner of L&R, explained Liddle's management of the firm:

> In his capacity as the managing partner of L&R, Liddle ran the Firm to the exclusion of his "partners." In fact, Liddle made virtually every significant business and financial decision concerning the Firm's business and finances without consulting his partners.

*Affidavit of James Ryan Hubbard, Esq. dated January 24, 2019* (the "Hubbard Affidavit"), a copy of which is annexed to the Wander Dec. as **Ex. A**.

18.    Until recently, the Firm had a robust litigation practice, with fourteen lawyers, plus eight support staff and two paralegals.  There were five partners and revenues were in excess of $13.5 million. *Affidavit of Jeffrey L. Liddle Under Bankruptcy Rule 1007-2,* at ¶¶ 2, 6, Wander Dec. at **Ex. B** (the *"Liddle Affidavit"*).

19.    Liddle's lavish lifestyle, however, caused the firm to go into debt and eventually all of his partners left the Firm.  Blaine Bortnick, Esq., a former partner who had been with the Firm for twenty years, stated:

> … although the firm was profitable … through 2015, Mr. Liddle
> had taken nearly $2 million from the firm to pay for his lifestyle of
> two conjoined Fifth Avenue apartments and a lavish Hamptons
> residence. Had Mr. Liddle not withdrawn this sum from the firm
> which he had not earned, it would not have experienced the
> extreme cash flow crisis with the resulting flight of the vast
> majority of its partners.

*Objection To Motion By Debtor Liddle & Robinson, L.L.P. Pursuant To Bankruptcy Rule 2004*

*and §105(a) of the Bankruptcy Code, for an Order Directing (I) Examination of Blaine H.*

*Bortnick, and (II) Production of Documents By Blaine H. Bortnick, Along With Related Relief*

("Bortnick Objection"). *Doc. 82*, at ¶ 7.

20.    By 2017, revenues were down to $5 million and, by January of 2019, the exodus

of partners was completed; all that remained was Liddle and one associate. *See Statement of*

*Debtor's Financial Affairs dated 9/10/19, In re Liddle & Robinson*, Case No. 19-12346, Doc. 61;

*Liddle Affidavit* at ¶ 3.

### 4. L&R is evicted and Liddle stops paying taxes and maintaining the Firm's books and records

21.    In 2017, L&R stopped paying rent for its offices at 800 Third Avenue and, in

September, 2018, the Firm was evicted.

22.    Around that time, Liddle stopped maintaining the Firm's books and records. He

also stopped paying his personal taxes and the Firm's taxes.

- Tax returns for 2017 and 2018 were not filed. *See Motion to Employ Richard J. Lynne as Tax Accountant at* ¶ 9. Doc. 61.

- Payroll tax returns for 2018-2019 were not filed. *Id.*

- Tax forms for the Firm's retirement plans for 2017 and 2018 were not filed. *See Motion to Employ The Benefit Practice.* [Doc. 38] at ¶9.

- New York State unemployment contributions were not paid. *See NYSDOL Proof of Claim* (Claim No. 12)*.*

4

- The IRS has filed a proof of claim in this case for $114,157 covering tax years 2015-2018. *See IRS Proof of Claim* (Claim No. 60).

### 5. **L&R files for bankruptcy protection**

23.    On July 22, 2019, after months of telling the Bankruptcy Court that he intended to put L&R into bankruptcy, *see Liddle Affidavit* at fn. 2, L&R filed a chapter 11 petition for reorganization.[2]

24.    According to Liddle, the Firm's assets and liabilities (excluding contingent liabilities) each total approximately $10 million. *See In re Liddle & Robinson, LLP,* Case no. 19-12346-shl, Doc. No. 2, *¶14*.

25.    On October 23, 2019, Counsel Financial filed a motion to convert the L&R chapter 11 reorganization to a chapter 7 liquidation because L&R, a partnership with only one remaining partner, is ineligible to file a chapter 11 petition for reorganization; it is already in dissolution and must wind down its affairs, as a matter of state law.[3] *See, In re Hagerstown Fiber Ltd. Partnership*, 226 B.R. 353 (Bankr. S.D.N.Y. 1998); *In re C-TC 9th Ave. Partnership*, 113 F.3d 1304 (2d Cir. 1997). As the Second Circuit held, "a partnership in dissolution is not a 'person' eligible to avail itself of reorganization in Chapter 11." *In re C-TC 9th Ave. Partnership*, 113 F.3d at 1304, 1309 (2d. Cir. 1997).

### 6. **Debtor's pre-petition sale of the Fifth Avenue Co-op and frivolous homestead claim**

26.    In December of 2018, Liddle and his wife sold their two, adjoining cooperative apartments at 11 Fifth Avenue, New York, New York for $6.5 million and the net proceeds totaled $2,181,208 ("Net Co-op Sale Proceeds").

---

[2] The L&R chapter 11 was filed as a related case and the two cases are being jointly administered. *See Doc. 150.*

[3] L&R's ineligibility to reorganize under chapter 11 was first raised by the United States Trustee's Office.

27.     As of the Petition Date, the Net Co-op Sale Proceeds were held in escrow, by Diane Nardone, Esq., pursuant to an Order of the Supreme Court of the State of New York, Erie County.  After the Petition Date, the Net Co-op Sale Proceeds were transferred to the Debtor's debtor-in-possession account, pursuant to an Order of the Court. *Doc No. 27.* Thereafter, $1,090,603 was transferred from the DIP account to Tara Liddle, the Debtor's spouse, representing her 50% interest in the Net Co-op Sale Proceeds.

28.     CF2 claimed a security interest in the Debtor's 50% interest in the Net Co-op Sale Proceeds.  However, after extensive briefing and oral argument, the Court rendered a decision determining that CF2 did not have a perfected security interest.[4]

29.     In Schedule C of the Petition, Liddle asserted a homestead exemption of $170,825, based upon the Net Co-op Sale Proceeds.  Counsel Financial filed an objection to the Debtor's homestead objection and sought sanctions because the Debtor's homestead claim had no legal basis and was frivolously made, obviously with the hope that no one would object.

30.     As of the hearing on November 26, 2019, the Court upheld Counsel Financial's objection to the Debtor's homestead claim.

## 7.  **Debtor's Hamptons mansion**

31.     The Debtor owns a huge, Spanish style mansion in the Hamptons, with a pool, pool house, tennis court, located on a beautiful property at 560 Main Street, Quiogue, New York (the "Hamptons Mansion").  The Debtor also owns the adjacent property, 554 Main Street, which is a flag lot with most of the property located behind the Hampton's Mansion.  The Debtor valued the Hamptons Mansion, in 2014, at $11,250,000: (i) 560 Main Street was valued at

---

[4] CF2 has appealed the Court's decision on this issue and appellant's brief is due December 13, 2019.

$9,500,000; and (ii) 554 Main Street was valued at $1,750,000.[5] Now, the Debtor claims the Hamptons Mansion is worth only $3,500,000 and the flag lot only $800,000, for a total of $4.3 million.[6]

32.     The Debtor has a mortgage on 560 Main Street with M&T Bank, and no mortgage on 554 Main Street.  As of the Petition Date, the M&T mortgage was $2,721,749, including unpaid principal of $2,565,768, and the monthly payment was $15,094.  *See Claim No. 14* filed by M&T.  The Debtor has not made any payments to M&T post-petition, whether on account of the mortgage payments or for adequate protection.[7]  In July, the Debtor paid $38,587 for property taxes on the Hamptons mansion.

33.     The Debtor refuses to sell or rent the Hamptons Mansion.  This past summer the Debtor's daughter lived in a small cottage on the flag lot.

## 8.  <u>Debtor Transfers Personal Property to Family Members</u>

34.     Prior to the Petition Date, the Debtor claims that he transferred some of his personal property[8] to his wife and children, without any apparent consideration or documentation, including his valuable wine collection, other collectibles, and vehicles.

---

[5] See Personal Financial Statement dated 3/25/14 given by Liddle to Signature Bank, a copy of which is annexed to the Wander Dec. as **Ex. F** (to be filed under seal).

[6] In 2014, the Debtor valued 560 Main Street at $9,500,000 and 554 Main Street at $1,750,000. *See* Wander Dec., **Ex. F**.  As of the Petition Date, however, the Debtor's valuation of 560 Main Street was reduced to $3,500,000 and 554 Main Street to $800,000. *Doc. 56, Schedule A/B.*

Further, in 2016, the Debtor valued his furniture and fixtures at $150,000. *See Attorney Financial Statement given to Counsel Financial by the Debtor, dated July 25, 2016, Wander Dec.* **Exh. G** (to be filed under seal). However, in the Debtor's Schedule A/B, he lists the value of his household furnishings at only $4,000. *Schedule A/B, Doc. 56.*

[7] M&T has filed a motion for relief from the stay, to continue a foreclosure action pending in the Supreme Court for the State of New York, Suffolk Country, Index No. 612226/2018.

[8] This property includes collateral pledged by the Debtor to Counsel Financial to secure his guarantee of L&R's obligations to CF2, LIG, and CF Holdings.

7

35.     The Debtor has an extensive wine collection which he valued at $125,000.[9]  *See Doc. 56, Schedule B.*  However, the Debtor now claims that he transferred all of the wine to his wife and daughter so that they now, jointly, own the wine collection together with him.

36.     The Debtor owns other "collectibles" which he valued at $109,500.  *See Id.*  However, the Debtor now claims he only owns outright $9,500 of the collectibles, while $100,000 is jointly owned with his wife. *See Id.*

37.     The Debtor owns two vehicles, but he claims they were transferred to his children: (i) a 2013 Jeep Wrangler valued at $12,500 was "gifted" to his daughter; and (ii) a 2008 Jeep Cherokee was "gifted" to his son.[10] *Id.*

### 9.   Debtor's Liabilities

38.     The Debtor's liabilities includes secured debts, priority unsecured debts, and general unsecured debts, as well as administrative expenses of this estate.

39.     Whatever unencumbered assets the Debtor may have, they do not appear sufficient to satisfy administrative and priority claims of this estate, let alone provide for a distribution to unsecured creditors.  Thus, there is little, if any likelihood of a confirmable plan.

### a.   Secured Debts

40.      The Debtor has two principal secured creditors:[11]   (i) M&T Bank and (ii) Counsel Financial.

---

[9] The Debtor stores his wine collection in two locations, one place near his Hamptons mansion and the other place closer to his Manhattan apartment: (i) Long Island Wine Transporters and Storage in East Moriches, and (ii) Vintage Wine Warehouse in Ridgewood. The Debtor pays approximately $300 a month to transport and store his wine collection in the Hamptons.  It is unknown what amount the Debtor is paying Vintage Wine Warehouse.

[10] The Debtor also has his law firm lease a luxury vehicle for his wife even though she does no work for the firm.

[11] In addition to these secured claims, there are two other secured creditors.  First, VW Credit Leasing, Ltd. filed claim no. 10 as a secured claim in the amount of $15,404, relating to a 2017 Audi A6 leased by L&R and which is used by Liddle's wife. *See Claim No. 10.*  Secondly, the Debtor scheduled DeLage Landen Fin'l Services Inc. as

### i. **M&T Bank**

41.    M&T filed Claim No. 14 as a secured claim in the amount of $2,721,749.[12]   As discussed above, M&T has a mortgage on the Hampton's Mansion and the Debtor valued the property at $3,500,000. *See claim no. 14.*  M&T filed a motion for relief from the automatic stay, to continue a pre-petition foreclosure, and the hearing on this motion has been repeatedly adjourned.

### ii. **Counsel Financial**

42.    The Debtor owes Counsel Financial more than $9.0 million[13] in guaranty liability for loans to L&R,[14] and these claims are secured by liens on various assets of the Debtor, as well as all of L&R's assets.[15]

---

having a secured claim of $197,310 based upon a judgment lien from a lawsuit and "escrow proceeds" of $197,310. *See Schedule D.*

[12] Claim No 14. includes fifteen (15) consecutive monthly mortgage payments totaling $224,214 that the Debtor failed to pay prior to the Petition Date.

[13] CF2 filed claim no. 20 as a secured claim for $6,541,924; (ii) LIG filed claim no. 19 as a secured claim for $539,007; and (iii) CF Holdings filed claim no. 18 as a secured claim for $2,157,154.

[14] In 2016, Liddle refinanced the Firm's secured debt with Signature Bank, by obtaining a loan from CF2 for $5.6 million, and Liddle personally guaranteed the loan. In 2017, Liddle had the Firm borrow $1.5 million from LIG, and Liddle also had the Firm borrow from CF Holdings under a credit line that, originally, was for $1.0 million and later increased to $1,775,000, and Liddle personally guaranteed both of these loans. When Liddle had L&R first borrowed $5.6 million from CF2, the Firm had about 90 active cases and, upon information and belief, Liddle projected these cases would generate net fees of approximately $56,000,000 over the next 3 years.

[15] Both L&R and Liddle pledged all their assets as collateral for each of these loans. Liddle previously acknowledged his indebtedness to Counsel Financial, LIG and CF Holdings in the approximate amount of $7.8 million, pursuant to a stipulation that he signed both individually and on behalf of L&R on January 22, 2018. *See* Wander Dec., **Ex. D**. In addition, CF2 obtained a judgment dated March 7, 2019 against both L&R and Liddle, entered in the Supreme Court of the State of New York, Erie County, Index No. 814703/2018, for $6,541,924. *See* Wander Dec., **Ex. E**.

L&R's current cases need to be valued in order to determine the extent to which CF2, LIG, and CF Holdings are secured, in accordance with §506(a) of the Bankruptcy Code. L&R has recovered or is about to recover, more than $3.0 million in fees in just a few months.  The value of L&R's other cases, as of July 22, 2019, when L&R filed for bankruptcy protection, together with Liddle's personal property subject to Counsel Financial's liens, are likely worth more than $6.0 million, thereby, at least, making CF2 fully secured.

43.    L&R defaulted on all these loans by failing to remit a portion of the Firm's

collections to Counsel Financial. As former partner James R. Hubbard, Esq., stated:

> Thereafter, at Liddle's direction, L&R proceeded to borrow the full
> amount of its $5.6 million line of credit under the Note, as well as
> additional monies from affiliates of CF2. Under Liddle's
> supervision and control, L&R defaulted on all those loan
> obligations. Liddle, who was in sole control of L&R's finances,
> never once caused the Firm to comply with its initial obligation to
> repay to CF2 against the principal amount of the Firm's borrowing
> an amount equal to 10% of all contingent attorneys' fees collected
> by the Firm within three business days of receipt thereof. That
> course of conduct continued when Liddle persisted in failing to
> remit to CF2 any collected contingency fees whatsoever. Those are
> a part of a series of defaults under the Firm's loan documents with
> CF2 caused by Liddle's management of the Firm.

*Hubbard Affidavit*, **Wander Dec. at Ex. A**.

### b. Priority Claims

44.    The Debtor has priority tax claims totaling in excess of $200,000.  This includes:

(i) Claim No. 7 filed by the IRS for $117,222, of which $114,157 is listed as a priority claim;[16]

(ii) Claim No. 1 filed by the NYS Department of Taxation and Finance for $34,423;[17] (iii) Claim

No. 6 filed by the NYS Department of Labor in an undetermined amount; and (iv) the Debtor

listed the Town of Southampton as having an undisputed, non-contingent, liquidated priority

claim in the amount of $47,504, along with an unsecured claim in the amount of $47,750.  *See*

*Schedule E/F, Doc. 56*.

### c. Unsecured Claims

45.    Although no bar date for filing claims has been fixed by the Court, general

unsecured claims have already been filed totaling approximately $900,000.  *See* **Wander Dec.,**

---

[16] The IRS' claim includes estimated amounts of $55,720 for income taxes for 2017 and 2018 because the Debtor
failed to file a return for those years.  The Debtor listed the IRS as having an undisputed, non-contingent, liquidated
claim in the amount of $123,195.  *See Schedule E/F, Doc. 56.*

[17] The Debtor listed this claim as undisputed.  *See Schedule E/F, Doc. 56.*

Ex. C. In addition, three claims for malpractice totaling in excess of $37 million have been filed.[18] *Id.* The Debtor, himself, also scheduled approximately $1,000,000 in undisputed, general unsecured claims.

### 10. **Huge, Ongoing Losses of the Estate**

46.    The Debtor's estate has suffered huge, ongoing losses since the Petition Date and there is no end in sight. These losses exceed One Million Dollars through November 2019 and these huge losses have been papered over by the Debtor's MORs, which include $1 million in phantom income.[19]

47.    These huge losses are a combination of the Debtor's extravagant lifestyle,[20] whereby his expenses far exceed his income, the Debtor's unreported, mortgage payments on his Hamptons mansion, and the Debtor's unsustainable professional fees.  The Debtor's professional fees will soon exceed the sale proceeds from the Debtor's cooperative apartment.  Thus, even if these funds are unencumbered, they have already been depleted.  The Debtor's only remaining unencumbered asset appears to be 554 Main Street, the flag lot behind the Hamptons Mansion, which the Debtor's daughter occupied this past summer.

---

[18] The extent of insurance coverage for these claims is unclear.

[19] Net proceeds of $2,181,208 from the Debtor's pre-petition sale of his Fifth Avenue cooperative apartment were transferred from an escrow account to the Debtor's DIP account and recorded by the Debtor's accountants as "cash receipts."  This mischaracterization of these funds, together with the mischaracterization of $1 million in payments to the Debtor's wife, approved by the Court, as "expenses" has skewed the results of the Debtor first eight months in chapter 11 and masked the estate's huge losses.

[20] The Debtor's extravagant lifestyle has not changed, even though he is in chapter 11. The Debtor continues to maintain a mansion in the Hamptons, which he refuses to sell or even rent.  The Debtor has two storage facilities for his wine collection.  The Debtor supports two adult children.  The Debtor pays for a membership in an indoor tennis club.  The Debtor pays thousands of dollars a month to store his personal property.

48.    Liddle's monthly income totals $18,701, a fraction of his monthly expenses.[21] Liddle's monthly draw from the Firm is $15,000, which is not even enough to cover the mortgage on the Hampton's Mansion.  Liddle also receives $3,701 a month in social security, which is not nearly enough to cover his remaining expenses.[22]  *See, e.g., August MOR, Doc. 198.*

49.    According to the MORs, excluding professional fees, the Debtor's estate suffered losses through October totaling $147,474:

| Month | Amount-$ |
|---|---|
| March | 285 |
| April | 11,931 |
| May | -28,761 |
| June | -19,592 |
| July | -54,453 |
| August | -43,377 |
| September | -992 |
| October | -12,230 |

---

[21] While the Debtor listed monthly expenses on his Schedule J totaling $46,432, the Debtor's reported expenses have ranged from approximately $19,000 to $73,154. See MORs for April, May, June, July, August, September, and October 2019. Moreover, more than $70,000 in personal expenses by the Debtor have been lumped together in a category labeled "Other" without any itemization or disclosure of the expenses included in this category: April ($6,122), May ($11,926), June ($11,944), July ($3,257), August ($33,934), September ($3,100), October ($5,143). It is impossible to determine, from reviewing the bank statements, what items are included in this category, or even what items relate to Liddle personally or the Law Firm, because all of the law firm's income and expenses were commingled with the Debtor's DIP account.  As a result of this opaque reporting by the Debtor's accountants, expenses that were not included in the Debtor's budget, e.g. the Debtor's membership in a racquet club, can be glossed over or even go undetected.

[22] Notably, in Schedule I, the Debtor listed only $6,133 in monthly income from his law practice and did not list any social security payments. *Doc. No. 56.* The Debtor also listed $5,943 for his wife's total monthly take-home pay. *Id.*

50.    The Debtor's professional fees through October total $848,488:[23]

| Month | Attorneys Fees ($) | Accountants Fees ($) |
|-------|-------|-------|
| April | 135,783 | 0 |
| May | 163,824 | 43,850 |
| June | 142,996 | 31,670 |
| July | 120,968 | 32,498 |
| August | 62,887 | 21,460 |
| September | 101,189 | 12,210 |
| October | 41,872 | $5,795 |
| **TOTAL** | 701,002 | 147,485 |

First and Final Fee Application by Torys [*Doc No. 228*]; Monthly Fee Statements of Foley Hoag [*Doc Nos. 222-225; 242-243*]; and Monthly Fee Statements of EisnerAmper [*Doc No. 189-192; 215; 239*]. Together with the accrued professional fees for November 2019, this estate has lost more than One Million Dollars.

## RELIEF REQUESTED

### DEBTOR'S CHAPTER 11 REORGANIZATION SHOULD BE CONVERTED TO CHAPTER 7, PURUSUANT TO §1112(b) OF THE BANKRUPTCY CODE, BECAUSE THERE HAS BEEN SUBSTANTIAL DIMINUTION OF THE ESTATE AND THERE IS NO REASONABLE LIKELIHOOD OF REHABILITATION

51.    Movant seeks an order converting this chapter 11 reorganization to a liquidation under chapter 7, pursuant to § 1112(b) of the Bankruptcy Code, which provides that "the court shall convert a case … or dismiss a case … whichever is in the best interest of creditors and the estate, if the movant establishes cause." 11 U.S.C. § 1112(b) (emphasis added).

52.    Section 1112(b)(4) provides a non-exhaustive list of examples of conduct amounting to "cause" warranting conversion of a chapter 11 case.

---

[23] The Debtor first retained Torys LLP as his bankruptcy counsel, beginning in April after filing his chapter 11 petition *pro se*, and when the partner in charge of the engagement switched firms to Foley Hoag, shortly thereafter, Foley Hoag took over representation of the Debtor. The Debtor retained EisnerAmper as his accountants, beginning in May.

53.     Under § 1112(b)(4)(A), cause for conversion or dismissal of a case is established if there is a "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." 11 U.S.C. § 1112(b)(4)(A).

54.     Here, both prongs are easily established

## 1. **Substantial and continuing losses**

55.     Courts have held that "negative cash flow post-petition and an inability to pay current expenses" is sufficient to show a substantial or continuing loss to the estate. *In re Adbrite Corp.* 290 B.R. 209, 215 (Bankr. S.D.N.Y. 2003); *see In re BH S & B Holdings LLC*, 439 B.R. 342, 347 (Bankr. S.D.N.Y. 2010) (Debtor's monthly Statement of Operations showing a cumulative loss of $128,968,353 since the bankruptcy filing date satisfied the substantial or continuing loss prong); *In re Sillerman*, 2019 WL 5061177, *19 (Bankr. S.D.N.Y. Oct. 8, 2019) (where debtor's only consistent source of disclosed income was his monthly social security payment of $3,721.00 and the monthly operating reports showed that "the cash on hand in the estate has continued to decline throughout the life of the estate," was deemed sufficient to satisfy the substantial or continuing loss prong).

56.     Here, it cannot be disputed that Liddle does not have enough cash flow to pay his personal monthly expenses. Liddle's monthly income consists of his social security payment of $3,701.00 and his monthly draw from L&R of $15,000. The combined income of $18,701 is woefully inadequate to pay Liddle's recurring monthly expenses, let alone the staggering professional fees that Liddle is incurring.

57.     The excess of the Debtor's expenses over his income and the accrued professional fees have resulted in negative cash flow post-petition of more than One Million Dollars!

2.  **There is no reasonable likelihood of rehabilitation**

58.    There also is no reasonable likelihood of rehabilitation in this case.

59.    Regarding § 1112(b)(4), rehabilitation does not mean the same thing as reorganization. *In re Adbrite Corp.*, 290 B.R. 209, 215 (Bankr. S.D.N.Y. 2003). Instead, "[r]ehabilitation of a debtor's estate implies the re-establishment of a sound financial basis, a concept which necessarily involves establishing a cash flow from which current obligations can be met. Reorganization on the other hand, can involve simple liquidation and distribution of assets." *In re Kanterman*, 88 B.R. 26, 29 (S.D.N.Y. 1988).

60.    To prove "an absence of a reasonable likelihood of rehabilitation, the movant must show that there is no more than a hopeless and unrealistic prospect of rehabilitation." *In re Adbrite Corp.*, 290 B.R. 209, 215 (Bankr. S.D.N.Y. 2003). The second prong "may be satisfied if the movant demonstrates that the debtor will not have cash flow from which its current obligations can be met." *In re Sillerman*, 2019 WL 5061177, *19 (Bankr. S.D.N.Y. Oct. 8, 2019); see e.g. *Matter of Denrose Diamond*, 49 B.R. 754, 757 (Bankr. S.D.N.Y. 1985) (rehabilitation was not possible where "persons knowledgeable of Debtor's finances reported both the need to infuse large amounts of money into the Debtor and the absence of any realistic prospect of obtaining such funding").

61.    In the present case, Liddle has insufficient funds or other assets to fund a plan. He cannot even pay administrative and priority creditors, let alone unsecured creditors. *In re Lizeric Realty Corp.*, 188 B.R. 499, 503 (Bankr. S.D.N.Y. 1995), *as amended* (Nov. 28, 1995) ("Section 1112(b)(1) of the Code is intended to preserve estate assets by preventing the debtor in possession from gambling on the enterprise at the creditors' expense when there is no hope of rehabilitation.")

62.    When this case was filed, the Debtor had over one million dollars in cash that could have been used to pay creditors, but now it appears all of that cash will be paid to bankruptcy professionals.  When this case was filed, the Debtor had over one million dollars in equity in real estate in the Hamptons, but each month that equity cushion declines through the accrual of post-petition interest.

63.    The Debtor's law firm is in bankruptcy and, under applicable New York law, is in dissolution and should be winding down because there is only one remaining partner.  Upon information and belief, the Debtor's current valuation of the Firm's assets is insufficient to satisfy the secured debts owed to Counsel Financial and the priority and administrative expenses of the Debtor's estate. Accordingly, the Debtor cannot rely on the Firm or his present book of cases to fund a confirmable plan.

64.    Liddle's reorganization strategy, if it can be called that, appears to be litigating against everyone and anyone against whom he can conjure up a claim.  For example, Liddle wants to sue (i) nine of his former partners,[24] (ii) his former attorney, Les Corwin, Esq., and the two firms where Mr. Corwin was practicing when he represented Liddle, (iii) Counsel Financial,

---

[24] Liddle has asserted many claims against his former partners, including: (i) claims against former partner Blaine Bortnick, for contribution, an accounting, tortious interference with contract and prospective advantage, defamation, breach of partnership obligations and guarantees; (ii) claims against former partner James R. Hubbard, for contribution, an accounting, breach of partnership obligations, for reimbursement of personal expenses; (iii) claims against former partner James W. Halter, for tortious interference; (iv) claims against former partner Christine Palmieri, for contribution; (v) claims against former partner Marc Susswein, for contribution; (vi) claims against former partner, Ethan Brecher for contribution, repayment of negative capital account; (vii) claims against former partner James A. Batson, for contribution; (viii) claims against former partner David M. Marek, for contribution; and (ix) claims against former partner Michael Grenert, for contribution and repayment of capital account. *See schedule A/B, Doc. 56; see also In re Liddle & Robinson LLP, Case no. 19-12346-shl, Doc. 60, Schedule A/B* (listing lawsuits to be filed).

its principals, its attorneys in this case, Davidoff Hutcher & Citron LLP, and one of the law firm's partners.[25]

65.    Cause to convert this case under § 1112(b) has clearly been established. There are no unusual circumstances the Debtor can establish to show that converting this case is not in the best interests of creditors and the estate. Nor can the Debtor show that there is a reasonable likelihood of rehabilitation. *In re Kanterman*, 88 B.R. 26, 29 (S.D.N.Y. 1988) (holding that absence of a reasonable likelihood of rehabilitation was based on the debtor's lack of a sound cash flow from which its current obligations could be met).

66.    Conversion to chapter 7 will stop the hemorrhaging of the Debtor's estate and a chapter 7 trustee can also investigate the apparent fraudulent transfers by the Debtor to his wife and children. A fiduciary would be able to prosecute claims against recipients of fraudulent transfers. This case is a prime example of the need for an independent fiduciary to examine the transactions between Liddle and his family members. *In re FRGR Managing Member LLC*, 419 B.R. 576, 582 (Bankr. S.D.N.Y. 2009) (holding that a chapter 11 case must be converted to chapter 7 for the purpose of pursuing fraudulent transfer claims, *inter alia*).

67.    Meanwhile, the Debtor's wife now has a million dollars that she can use to support the Debtor's extravagant lifestyle, instead of having Liddle's creditors foot the bill.

## CONCLUSION

68.    As shown above, "cause" has been established to convert this chapter 11 reorganization to a chapter 7 liquidation.  The Debtor's estate has already lost over $1 million and these huge, ongoing losses have no end in sight.  The Debtor's present income can cover

---

[25] Like Captain Queeg, Liddle sees conspiracies everywhere.  According to Mr. Bortnick, at the time of his departure from the firm Liddle was "regularly resorting to wild conspiracy theories" and accused Bortnick "of all manner of things" including stealing clients and conspiring with the Firm's lender. *Bortnick Obj.*, at ¶ 9

only a fraction of his monthly expenses. There are no facts showing the Debtor's financial rehabilitation is reasonably likely, or even possible.

## Notice of Motion

69.       Notice of this motion will be given, by ECF or first class mail, to the (i) Debtor and counsel, (ii) all creditors listed in the Petition or who filed a proof of claim, (iii) the U.S. Trustee's office, and (iv) each person or entity that filed a notice of appearance.

## Proposed Order

70.       A proposed Order granting this motion is annexed as **Exhibit A.**

71.       No prior application for this relief has been made.

**WHEREFORE,** Counsel Financial requests the entry of an order granting the relief requested, for which no previous application has been made, and that the Court grant such other and further relief it deems just and proper.

Dated: New York, New York
      November 27, 2019

DAVIDOFF HUTCHER & CITRON LLP

By:/s/ David H. Wander
     David H. Wander
     Alexander R. Tiktin
605 Third Avenue
New York, New York 10158
(212) 557-7200
dhw@dhclegal.com
art@dhclegal.com

*Attorneys for Counsel Financial II LLC, LIG Capital LLC, and Counsel Financial Holdings LLC*

18

# EXHIBIT A

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
In re:                                                    Chapter 11

JEFFREY L. LIDDLE,                                        Case No. 19-10747-shl

                              Debtor.
-------------------------------------------------------X

### ORDER GRANTING MOTION BY COUNSEL FINANCIAL II LLC, LIG CAPITAL LLC, AND COUNSEL FINANCIAL HOLDINGS LLC, PURSUANT TO § 1112(b) OF THE BANKRUPTCY CODE, TO CONVERT THIS CHAPTER 11 REORGANIZATIONTO A CHAPTER 7 LIQUIDATION

Upon the motion dated November 27, 2019 of Counsel Financial II LLC, LIG Capital LLC, and Counsel Financial Holdings LLC (collectively "Counsel Financial"), by their attorneys, Davidoff Hutcher & Citron LLP, for an order, pursuant to § 1112(b) of the Bankruptcy Code, converting this chapter 11 case to a chapter 7 liquidation (the "Motion"); and it appearing that good and sufficient notice of the Motion has been given; and a hearing on the Motion having been held on November 26, 2019; and after considering all papers filed in connection with the Motion; and upon the record of the hearing; and after due deliberation; and good and sufficient cause appearing therefor, it is hereby

ORDERED,  that the Motion is granted; and it is further

ORDERED,  that this case is converted to chapter 7, pursuant to § 1112(b) of the Bankruptcy Code.


Dated: New York, New York

2

November __, 2019

_

SEAN H. LANE
UNITED STATES BANKRUPTCY JUDGE