UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re<br><br>LIDDLE & ROBINSON, L.L.P.,[1]<br><br>Debtor | Chapter 11<br><br>Case No. 19-12346 (SHL) |
| In re<br><br>JEFFREY LEW LIDDLE,<br><br>Debtor | Chapter 11<br><br>Case No. 19-10747 (SHL) |

**AFFIDAVIT OF JEFFREY L. LIDDLE
IN OPPOSITION TO THE CONVERSION MOTIONS[2]**

STATE OF NEW YORK     :
                      SS:
COUNTY OF NEW YORK    :

Jeffrey L. Liddle, being sworn, deposes and says:

**Summary**

1.    I am the Debtor and Debtor-in-Possession in the above-captioned Jeffrey Lew Liddle chapter 11 case (sometimes, the "individual Chapter 11 case") and the sole remaining partner of Liddle & Robinson, the Debtor and Debtor-in-Possession in the above-captioned Liddle

---

[1] The last four digits of Liddle & Robinson, L.L.P.'s taxpayer identification number are 6440.

[2] The Conversion Motions are: (A) *Motion of Counsel Financial II LLC, LIG Capital LLC, and Counsel Financial Holdings LLC Pursuant to § 1112(b) of the Bankruptcy Code, to Convert This Chapter 11 Reorganization to a Chapter 7 Liquidation* [Case No. 19-10747, Doc. No. 103]; (B) *Motion of Counsel Financial II LLC, LIG Capital LLC, and Counsel Financial Holdings LLC Pursuant to § 1112(b) of the Bankruptcy Code, to Convert This Chapter 11 Reorganization to a Chapter 7 Liquidation* [Case No. 19-12346, Doc. No. 249], (c) *Motion by Blaine H. Bortnick Pursuant to § 1112(b) of the Bankruptcy Code, to Convert This Chapter 11 Reorganization to a Chapter 7 Liquidation* [Case No. 19-10747, Doc. No. 130] (the "Bortnick Motion") and (C) *United States Trustee's Motion: (I) Pursuant to 11 U.S.C. § 1112, for Conversion of the Chapter 11 Case of Liddle & Robinson L.L.P. to a Case under Chapter 7 of the Code, or (II) In the Alternative, Pursuant to 11 U.S.C. § 1104, for Appointment of a Chapter 11 Trustee* [Doc. No. 257 filed in 19-10747, Notice of Motion filed in 19-12346 at Doc. No. 155].

B5071803.9

& Robinson Chapter 11 case (sometimes, the "firm Chapter 11 case"). I submit this affidavit in opposition to the motions by the three separate Counsel Financial Entities[3] (sometimes collectively, "Counsel Financial"), the United States Trustee, and Blaine Bortnick to convert these Chapter 11 reorganization cases to Chapter 7 to allow for the appointment of a Chapter 7 Trustee (the "Conversion Motions"). The relief sought in the Conversion Motions is not in the best interest of creditors, the estates in the individual and firm Chapter 11 cases, or other parties with interests in these Chapter 11 estates, particularly the clients of Liddle & Robinson.

2. Continuing these cases in Chapter 11 is essential to maximizing the value of these estates for the benefit of all creditors and thwarting a three-year campaign by Counsel Financial to exercise control and ownership over Liddle & Robinson's practice, clients, and cases for its exclusive benefit. I am fully familiar with the facts and circumstances set forth below.

3. The Conversion Motions are premised on two erroneous notions: that the law practice of Liddle & Robinson is moribund and that no viable plan can be confirmed in either case. In fact, the law practice is succeeding and the Debtors will be in a position to propose a viable plan with a substantial distribution to legitimate creditors in early 2020.

4. **Viability.** Liddle & Robinson will generate over $3.5 million in fee income this quarter. Operating expenses are running approximately $100,000 per month. The fee income was generated from judgments, arbitration awards, settlements, and hourly fee cases. There is an active trial calendar going forward into the first half of 2020. In addition, the Debtor-in-Possession has opened approximately two dozen new matters since the inception of these Chapter 11 cases. Six

---

[3] The Counsel Financial Entities are: Counsel Financial II LLC ("CF II"), LIG Capital LLC ("LIG"), and Counsel Financial Holdings LLC

2

B5071803.9

new cases have been filed or are soon to be filed. To paraphrase Mark Twain: the reports of the firm's demise are greatly exaggerated.

5. I have been informed that in the typical law firm bankruptcy case the productive partners and/or the clients have fled and the practice is defunct. In those cases, conversion to a Chapter 7 or the appointment of a Chapter 11 Trustee may well be warranted. The Trustee's role in those cases is as an undertaker. Here, Liddle & Robinson is generating fees, advising clients, conducting trials, obtaining new business, and filing new cases. There is a valuable active law practice that should be sustained in Chapter 11 to achieve the best results for the benefit of creditors and other parties in interest.

6. I believe this Court recognized early on that there was an active law practice worth protecting and preserving. I, in turn, promised this Court that I would work diligently in maintaining client relationships, litigating and settling cases, and sustaining that practice. Converting the cases or appointing a Trustee will only scupper this effort.

### The Twin Goals of Asset Maximization and Dissolution of the Partnership Can Be Best Accomplished Through the Chapter 11 Process

7. New York Partnership Law empowers the sole remaining partner to wind-up the partnership and to operate the business during the dissolution process in order to maximize the return of assets. That is what I am doing. While there is no dispute that a one-partner partnership cannot be reorganized under Chapter 11, the timing and nature of the wind-up and dissolution of the partnership entity can be undertaken without losing focus on the twin goal of maximizing the value of the underlying law practice.

8.  There must be an accounting of the partnership in dissolution in accordance with generally accepted accounting principles, including a final accounting among the former partners.[4] The liabilities of the former partnership must be determined as of the date of the end of the partnership in January 2019, when James R. Hubbard, the penultimate partner, announced his departure. But that objective need not be achieved at the expense of maximization of the value of the estates. The successful practice of law has continued during these Chapter 11 cases although the business form of the practice may have changed into, on at least a temporary basis, a sole proprietorship. There is no need to sacrifice the valuable active law practice on the altar of the dissolution of the old partnership entity.

9.  Sustaining this law practice takes time and effort. Due to the nature of the practice of law, particularly a litigation practice such as Liddle & Robinson, many time frames between the inception of a matter and its conclusion are extended. A trial date may be adjourned, hearing dates moved, and even after an award is granted there may be significant time before it can be collected. Settlement discussions typically don't occur until the trial or arbitration is underway. The trauma of a Chapter 7 conversion or appointment of a Chapter 11 trustee will be highly disruptive to maintaining this practice.

10. A Bankruptcy Trustee cannot maximize the value of the law practice. The clients are free to select new counsel. The Liddle & Robinson practice has stayed intact based on my reputation, my relationship to the clients, and the sweat equity I am contributing to the practice.

---

[4] It is important to note that Attorneys Blaine Bortnick and James Hubbard, who supplied affidavits supporting the Conversion Motions, were signatories to and guarantors of the Counsel Financial II "loan." For their cooperation with the Counsel Financial Entities, they have apparently been insulated from liability for that obligation. They also generally bear responsibility for other partnership debts, such as rent, equipment leases, etc. Among the issues that need to be resolved as part of the dissolution of the partnership are the contribution claims of the partnership against its former partners for unsatisfied debts.

4

B5071803.9

The path that Liddle & Robinson and I have chosen in these Chapter 11 cases has maximized the value of these cases. I am confident that success will continue for at least the next six months. The alternatives suggested by the Conversion Motions threaten that success.

### **The Chapter 11 Filings Blocked Piecemeal Dismemberment of the Estate**

11. Counsel Financial, one of the parties now seeking to convert these cases, is the same party whose pre-petition efforts to confiscate all my and my wife's liquid assets propelled me and Liddle & Robinson into Chapter 11 in the first place. Counsel Financial had obtained a Judgment and an Order of Attachment[5] against the Sale Proceeds of my and my wife's home pursuant to which all Sale Proceeds were to be sent to the Court Registry in Erie County where the collection action was pending. The filing of the individual Chapter 11 case stayed that effort.

12. The filing of the individual Chapter 11 case also stayed, thanks to this Court's intervention, Counsel Financial's pre-petition communications with the bulk of Liddle & Robinson's clients directing them to remit all payments due Liddle & Robinson to Counsel Financial. At the first hearing of the individual Chapter 11 case, this Court clearly and actively extended the protections of the Bankruptcy Code to the active practice and client relationship I described to the Court.

13. My personal bankruptcy filing in March, the orders of this Court in April, May and June extending the section 105 stay to Liddle & Robinson, and the filing of the firm in July, were necessary steps to block the piecemeal dismemberment of my personal and the firm's assets by the Counsel Financial Entities. It has taken several months, and a bruising contested cash collateral

---

[5] The Judgment and the Order of Attachment have been appealed to the Appellate Division: Fourth Department. *In re Liddle & Robinson, LLP, Jeffrey L. Liddle v. Counsel Financial II LLC*, Case Nos. 19-01661 and 19-01662. (4th Dept. 2019)

fight, to recover, but the firm has recovered. The distinction between operating the firm in the ordinary course in Chapter 11 as opposed to in liquidation under a Chapter 7 Trustee was critical to stabilizing the firm and maintaining client relationships. Converting the cases now threatens to undo the progress that has been made.

14. The Chapter 11 filing of the firm was discussed in Court from the very beginning of the individual Chapter 11 case in March. No party objected that Liddle & Robinson could not file for Chapter 11 relief at the many hearings in March, April, May, June and July. In fact, the strong feeling was that good order augured in favor of separate cases and separate DIP accounts. The "case within a case" rubric articulated by the Court at the very hearing was essential and necessary, but awkward. My individual creditors and Liddle & Robinson's creditors overlapped, but were not identical. Several creditors, including Kasowitz Benson, objected to further extensions of the Section 105 stay until the firm filed for chapter 11. My attorneys fielded numerous inquiries, including from the accounting arm of the Office of the United States Trustee, as to when the firm would file. The filing of Liddle & Robinson had consensus support.

15. Counsel Financial's positon that the Liddle & Robinson filing was unnecessary is driven wholly by self-interest. The firm's filing cut off their putative security interest in Liddle & Robinson's post-petition assets. Their opposition was predicated on their desire to horde all the assets for themselves, including hourly work and work for new clients and matters generated after the firm Chapter 11 filing. Freeing up Liddle & Robinson's post-petition assets was crucial to developing a funding mechanism for the benefit of all legitimate creditors.

16. **Feasibility.** Another faulty premise of the Conversion Motions is that there is no hope for a successful Chapter 11 plan. In fact, based on recent settlements and trial successes, and a pipeline of approximately six cases scheduled or expected to be tried in the first half of 2020, it

6

B5071803.9

is my firm hope that Liddle & Robinson will be in a position to confirm a chapter 11 plan with a substantial distribution to all the estates' legitimate creditors.

17.     The amount of that distribution for allowed unsecured claims could be substantial. Several key building blocks are moving into place. First, we are in advanced discussions with several litigation claimants for settlement of pending cases within the limits of existing insurance policy coverage limits, eliminating approximately $5 million of claims against other firm estate assets. Second, we are actively negotiating a consent agreement with M&T Bank for a joint marketing plan for the Hamptons Properties. (One of the two Hamptons Properties is unencumbered.) Third, a number of unsecured claims are being satisfied from non-estate assets and have been, or will be, withdrawn. Fourth, as outlined below, and will be established in discovery scheduled to commence in January, there are grounds to recharacterize and/or equitably subordinate the claims of the Counsel Financial Entities.

18.     The plan will be a liquidation plan in the sense that there will be a final accounting, wind-up and dissolution of the pre-petition Liddle & Robinson partnership. But the funding for the plan will come, primarily from the maximization of the value of the practice that exists and the development of further business at the law practice that emerges from this process. Allowing me to continue to resolve contingency fee and other cases by trial, hearing, or settlement over the next six months will maximize the value of the estate and provide the largest possible distribution to the estate's legitimate creditors.

**Recharacterization, Equitable Subordination, and Lender Liability**

19.     In my opinion, the Counsel Financial Entities are not legitimate creditors of these estates. They are investors who take speculative interests in contingency fee cases. The Counsel Financial Entities have acted as owners or partners with a controlling interest in Liddle & Robinson

7

from day one of their relationship with the Firm in the Summer of 2016. For over three years, the Counsel Financial Entities has been engaged in a "loan to own" strategy focused on controlling Liddle & Robinson's cases for their own benefit, or for the benefit of other firms under their control. The Counsel Financial Entities effectively insinuated themselves into a managing partner function at Liddle & Robinson. Counsel Financial constantly used its position to assert dominion over every aspect of the financing and operations of Liddle &Robinson. Their claims should be recharacterized as equity accordingly.

20.     On four occasions Counsel Financial attempted to force the transfer of Liddle & Robinson's cases to other firms, including three times to Milberg LLP ("Milberg"), a firm they were instrumental in restructuring, refinancing, and over which they have exercised near financial and operational control.

21.     On at least three other occasions, Counsel Financial thwarted financing arrangements I had negotiated with other unrelated parties because it did not fit with their scheme to control the firm's cases and to deliver them to Milberg or another firm of their choosing. In sum, they reduced Liddle & Robinson, a profitable firm for thirty years, to a vassal state to be manipulated for the benefit of their various pools of investors.

22.     An analysis of the structure of the Counsel Financial Entities' business model and the administration of their "loans" to Liddle & Robinson under the microscope of applicable non-bankruptcy and bankruptcy law leads to the inexorable conclusion that their putative liens should be vacated, their "loans" should be recharacterized as equity and extinguished under a plan, and any residual claims should be equitably subordinated.

23.     Counsel Financial was a lender in name only. In two of the three so-called "loan agreements" there is explicitly no obligation to lend; in the third, the lending obligation is merely

implicit. Its obligations as a working capital provider were honored more in the breach than in the observance.

24. **<u>Deliberate Underfunding.</u>** Counsel Financial deliberately shorted the firm on working capital to make it easier to control and render its cases easy prey for transfer to an entity of Counsel Financial's choice. The "loans" had confiscatory interest rates which debilitated the firm, leaving it vulnerable to the constant demands from Counsel Financial to merge or transfer the cases. That effort to seize control began almost immediately after the closing of the first loan with CF II in the Summer of 2016. Of the $6 million face amount of the financing purportedly for working capital, $3,420,000 went to Signature Bank, approximately $1,100,000 went to the IRS[6], and approximately $150,000 went to closing fees. After reserves were established, under $1,000,000 was ever available for working capital.[7]

25. A day after the closing of the CF II "loan," Felice Callahan, the relationship officer, informed me that the "loaned" amount was "not going to be enough." There was simply insufficient amounts to fund working capital. Counsel Financial knew this all along. The Counsel Financial Entities took advantage of this situation by putting Liddle & Robinson into new loans which were usurious, and unsustainable and known by the Counsel Financial Entities at the time they were made to be insufficient to allow the firm to survive.

---

[6] I don't dispute that the initial loan included an amount of approximately $1.1 million to pay a personal tax debt. But it was the Counsel Financial Entities' idea to pay the debt, which they did, directly to the IRS. I was planning to pay the obligation out of a refinancing of certain property but the CF II insisted that it be paid as part of the loan. I believe their rationale was that they relied on my personal guaranty for security and didn't want to be behind the IRS as a creditor.

[7] When Liddle & Robinson questioned why Counsel Financial was charging such a high rate of interest (18%) for the "loans" Counsel Financial repeatedly represented that it was because Bank of America charges us 12%. But this wasn't true. Upon information and belief, Bank of America was charging the Counsel Financial Entities less than half that amount.

B5071803.9

26.     The second loan was made by LIG. This "loan" was not backed by the Bank of America and it is unclear what, if anything, Bank of America knows about it." It appears that some portion (possibly all) of this "loan" was funded by Counsel Financial officers, and possibly "friends and family" investors. The LIG loan was a term loan which greatly enhanced Counsel Financial's control over the firm. It needed to be repaid in full before Liddle & Robinson could again access the CF II working capital line. This limitation was crippling, especially because there was so little actual financing under the term loan. Liddle & Robinson needed and had requested $1.5 million in working capital, but the loan provided less than one-third of that. The $1.5 million face amount was primarily dedicated to repayment of the CF II loan, fees and an unauthorized $500,000 interest reserve.

27.     **Thwarting Refinancing Opportunities.** On at least two occasions, I had negotiated financing transactions which would have taken out Counsel Financial Entities in full, or in part, but they unreasonably refused consent or otherwise squelched the deal. It was imperative to Counsel Financial to control the purse strings.

28.     In April of 2017, I had independently negotiated a loan with Esquire Bank, an OCC-chartered Bank which would have taken out the CFII and LIG loans in full, replacing those usurious loans with market-rate financing. At the eleventh hour, I was informed that Counsel Financial, acting in bad faith, had refused to sign basic lien releases and other documents and killed the deal. Counsel Financial was unwilling to surrender control of the Liddle & Robinson cases largely because they were planning to transfer Liddle & Robinson's cases to Milberg. They were acting as an owner, not a lender. They were trying to sell Liddle & Robinson cases for their own benefit.

B5071803.9

## "Loan to Own" Control Efforts

29.     Having scuttled the Esquire Bank deal, Counsel Financial pursued its desired transaction for Liddle & Robinson. The attempted transfer of Liddle & Robinson's cases to Milberg exemplifies the type of control Counsel Financial exercised. In the Spring of 2017, Counsel Financial tried to induce Liddle & Robinson to combine with Milberg in a way that would be highly advantageous to Milberg and result in the elimination of Liddle & Robinson as a free-standing entity. Liddle & Robinson's cases were to be moved without any concern for how they were to be handled, or by whom, or what was in the client's best interest.

30.     At one point Counsel Financial counseled Liddle & Robinson to default on its lease to its landlord. When Liddle & Robinson asked where it would maintain offices, Counsel Financial said that Milberg would take over Liddle & Robinson's space and Liddle & Robinson would be able to use offices in the new Milberg space (which was the existing Liddle & Robinson space).

31.     Liddle & Robinson was a pawn in Counsel Financial's plan of rolling up law firms across the country and internationally with Milberg being a significant addition to their master plan for law firm acquisitions. Liddle & Robinson, or more accurately, Liddle & Robinson's cases, were to form the backbone of the critical New York office and provide work for the underemployed Milberg's New York lawyers. This merger foundered however when, through no fault of Liddle & Robinson, the Counsel Financial Entities could not strike a deal with Platinum Partners, and their side partners, the equity funders of Milberg. Counsel Financial's activities in driving mergers or sales of cases were the actions of an owner, not a lender.

32.     The Counsel Financial Holdings loan, the third loan, purportedly entitled Liddle & Robinson to borrow $1 million on its face. Counsel Financial represented this financing to be a "revolver" to "bridge" Liddle & Robinson until it could "merge" with Milberg. The entire purpose

of the loan from Liddle & Robinson's perspective was to obtain working capital. However, after imposing closing fees of approximately $32,000, Counsel Financial wired $185,000 to Liddle & Robinson's account at Citibank, established a $30,000 "two month interest reserve," and provided in the loan documentation that $500,000 of the loan was to be held by Counsel Financial to fund monthly interest payments on Liddle & Robinson's indebtedness on the two prior loans. $500,000 should have been available to fund Liddle & Robinson's working capital, but after deducting the $185,000 advanced at the closing and the closing costs, the "working capital" portion of the loan left was only $285,000 for future working capital advances.

33.    When Liddle & Robinson made a request for the disbursement of working capital in late June 2017, Counsel Financial refused to fund *any* drawdown. Liddle & Robinson was denied working capital because Counsel Financial had failed to close the merger with Milberg. The working capital needs of Liddle & Robinson were irrelevant.

34.    Although Counsel Financial did not complete the part of the Milberg transaction involving Liddle & Robinson at that time, it did reorganize Milberg by adding Glenn Phillips as co-managing partner. Attorney Phillips had previously worked with Counsel Financial in managing other firms as part of prior roll-ups. Twice more in 2018, Counsel Financial attempted to force a merger of Liddle & Robinson into the "new" Milberg. No further financing was extended during this period. Again, these attempted mergers by Counsel Financial were orchestrated as owners, not lenders. The interests of Liddle & Robinson'sclients were never considered.

**Tortious Interference with the Pierce Bainbridge Merger**

35.    The destructiveness of Counsel Financial's "loan to own" campaign culminated in the thwarting of a critical restructuring transaction with Pierce Bainbridge in March 2109 at the time of the filing of the individual Chapter 11 case.

12

36. Upon the departure of James Hubbard in mid-January 2019, it fell to me to operate the business while winding up the affairs of the partnership. (I learned of Mr. Hubbard's departure indirectly through a Court filing. Counsel Financial had more advance knowledge than I did.) I engaged a headhunter to try to find a suitable place to sustain the practice.

37. In February and March of 2019, I was concluding an agreement with Pierce Bainbridge which would have provided for the responsible handling of Liddle & Robinson's ongoing cases and provided employment for Liddle & Robinson's staff and associates.

38. The arrangement included an offer of partnership for me with a guaranteed minimum annual compensation of $600,000, plus a percentage of fees collected over a certain threshold, and compensation for work I brought into the firm. I was to be the prime East Coast business developer. I had been assured that Counsel Financial's litigation against me, and an individual Chapter 11 filing or even a firm filing by Liddle & Robinson, would not be an impediment to the deal.

39. Unbeknownst to me, Counsel Financial was simultaneously negotiating to provide financing to Pierce Bainbridge. When I learned of this, I expressed grave concerns but was informed that something would be worked out. I was asked to speak to the loan broker handing the discussions between the Counsel Financial Entities and Pierce Bainbridge. Those discussions didn't diminish my concerns.

40. On March 11, the day of the filing of the individual Chapter 11 case, Pierce Bainbridge contacted me with a shockingly different proposal that they had conjured up after consulting with Counsel Financial. Under the new proposal, Liddle & Robinson would transfer its cases to Pierce Bainbridge. In return, my wife and I would be allowed to keep the Sale Proceeds from my Co-op apartment. Pierce Bainbridge would receive 50% of the fees arising from the

13

settlements/judgements of the transferred Liddle & Robinson cases, and the Counsel Financial Entities would receive the remaining 50% until their "loans" were paid in full. I would not be employed at Pierson Bainbridge. Liddle & Robinson's employees and staff would not be hired. This formula left nothing for Liddle & Robinson's creditors. The transaction that I had hoped would have safeguarded the firm, its clients, the cases, its lawyers and staff, and me, had been destroyed. Counsel Financial had again wielded its power to exert control over the fate of Liddle & Robinson.

41. **<u>Interference with Contractual Relations.</u>** Prior to the filing, attorneys and other agents for the Counsel Financial Entities were in direct communication with Liddle & Robinson clients directing them to send all remittances due to Liddle & Robinson to the Counsel Financial Entities. The diversion of fees placed an enormous strain on the firm.

42. In many instances, Counsel Financial was working with former Liddle & Robinson partners to divert cases and fees. A prime culprit in this collusion campaign was, and is, Blaine Bortnick, one of the movants for conversion. Attorney Bortnick resigned from the partnership and joined Rasco Klock sometime in 2017. After his resignation, a fee of $1 million became due and payable to Liddle & Robinson in connection with the resolution of the case: *Passaretta* v. *UBS*. Counsel Financial engaged in discussions with Attorney Bortnick wherein Counsel Financial apparently agreed with Attorney Bortnick to forebear from calling his guarantee in exchange for his agreement to divert this fee from Liddle & Robinson to Counsel Financial. I am confident that Rule 2004 discovery of Attorney Bortnick will reveal other diversions of Liddle & Robinson cases and fees.

43. The diversion of the *Passaretta* fees was devastating. At the time, Liddle & Robinson was handling the *Beach & Vollero vs. Touradji Capital* case ("Beach & Vollero") but

14

needed that fee income to continue as counsel. Liddle & Robinson was forced to transfer the Beach & Vollero case to another firm for a modest fee. Counsel Financial used the diverted fee to pay its investors. Ultimately, successor counsel in Beach & Vallero won a $45 million judgment which, with interest, stands at over $91 million today.

44. Counsel Financial also squelched my efforts to get litigation funding for the Beach & Vollero case from Parabellum LLC, another litigation funder. The Counsel Financial Entities thwarted that deal through their connections in the litigation funding industry.

45. Counsel Financial's interference has extended to the actual handling of cases. Counsel Financial is coordinating with attorney Hubbard, who is lead counsel in the matter, *Church v. GlaxoSmithKline, LLC*. Counsel Financial has made it impossible for Liddle & Robinson to stay informed as to the case. Counsel Financial's attorneys, or their agents, seem to have insinuated themselves into the conduct of the matter.

46. My former partners have engaged in a simple *quid pro quo*. They have diverted Liddle & Robinson assets to Counsel Financial in order to be relieved of their direct or guarantor obligations to Counsel Financial. In some ways, I understand. They have seen Counsel Financial try to take my home, drive me into bankruptcy, attack my wife, and threaten my children. They have cut deals to protect themselves and keep me the focus of the fire. The best interests of the clients and legitimate creditors of Liddle & Robinson have been given short shrift.

### Usury

47. In considering how Counsel Financial's claim should be treated, this Court should also consider the exorbitant and usurious interest rates charged on the "loans." All the Counsel Financial "loans" involved extraordinary non-market interest charges and the improper

compounding of interest. As an example, the interest rate on the Holdings Loan exceeded $200% per annum. *See* the accompanying Wilen Declaration ¶ 17.

48. The "loans" are subject to New York law. The New York State Civil usury rate is 16%. The penal usury rate is 25%. New York General Obligation Law §5-501. This rate is applicable to loans to individuals, including loans to individual partners in a partnership. Moreover, to the extent any tranche of any loan was identified as being directed to or an individual's benefit the rule applies as well to that discrete portion of the loan. If a loan is made at a rate that exceeds 16%, the remedy is that the lender forfeits all interest. The lender cannot collect future interest, cannot "cure" by refunding the difference, and must refund all interest previously paid.

49. If a loan exceeds 25%, the penal usury rate, the remedy is that the lender forfeits the ability to collect any further interest and principal, and must refund any interest payments previously made. Without engaging in the lengthy exercise necessary to determine precisely what is the true interest rate that this foots to, it is manifestly clear that that rate applied under the Counsel Financial "loans" frequently exceeded the 25% penal rate under New York law. This is especially true when one considers that only a small percentage of the face amount of the "loans" was ever made available for working capital.

50. Because Counsel Financial believed that making a loan to a corporate entity would take that loan out of the scope of New York usury laws, Counsel Financial repeatedly tried to get Liddle & Robinson to represent that it was an LLC rather than an LLP. Towards this end, Counsel Financial prepared documentation which, had Liddle & Robinson not caught the attempt, would have falsely reflected that it was an LLC and that it otherwise had attributes that would facilitate Counsel Financial's attempt to portray it as a corporate borrower.

B5071803.9

51. **Abusive Collection Tactics.** Counsel Financial has constantly engaged in abusive tactics to collect its "loans," even directed at my family members. As this Court is well aware, Counsel Financial sought to attach my wife's interest in the Sale Proceeds of the New York cooperative apartment. The individual Chapter 11 case was necessary to stop the Counsel Financial Entities from seizing the Sale Proceeds from my, and my wife's, home. This abusive attack on my wife, who the Counsel Financial Entities knew had a separate ownership interest, who had no dealings with the Counsel Financial Entities, and who was not a defendant in any lawsuit, continued even in the Chapter 11 case until mid-September when this Court ordered the release of her funds from the DIP account. Despite knowing, by their own admission, that my wife owned one-half of the proceeds, Counsel Financial improperly expanded the Attachment Order to include my wife's interest and seized control of her property without due process of law. But for the intercession of this Court, they would still be denying her right of possession. These abusive tactics offend any notions of due process and fair play.

52. Her lawyer, Arnold Reiter, was insulted repeatedly in the Erie County, New York Supreme Court proceedings because he asked Counsel Financial "to do the right thing." Our escrow agent, Diane Nardone, was threatened and insulted as well. At one point, Larry Hutcher, Counsel Financial's lead lawyer in the Erie County litigation, left Ms. Nardone a voicemail in which he threatened to "file a grievance" against her and "sue [her] personally." He concluded, "You have been warned."

53. In the email exchanges surrounding the Erie County Court Order of Attachment, I was described as a "psychopath" by Felice Callahan. In their first filing in the Chapter 11 individual case, I was called a "fraudster." This ceaseless resort to threats and *ad hominen* attacks is beyond the pale.

54. Most recently, Attorney Wander sent my attorney an email saying that unless Liddle & Robinson settled within ten days, it would be my "death-knell," and there would be actions against "my wife and daughter." I have been a litigator for forty-five years. I know it is a tough game. I myself have been hard-nosed at times. But I have never seen anything like this, certainly not directed against family members. A colleague of mine derided these tactics as "Mafia-style" intimidation, but even the Mafia had a code about attacking family members.

55. In conclusion, I request that Your Honor deny the Motions to Convert and allow me to wind-up the affairs of the Liddle & Robinson partnership, the firm I founded and have run for forty years, maximize the value of the client relationships and active cases that I have been handling, propose a chapter 11 plan with a meaningful distribution for allowed claims, and be given the opportunity to prove that the claims of the Counsel Financial Entities should be recharacterized.

Dated: December 11, 2019
New York, New York

_____
Jeffrey Lew Liddle

Subscribed and sworn to before me
this 11 day of December, 2019

_____
Notary Public

ROSE M. REVERENDO
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01RE4908329
Qualified in New York County
Commission Expires   February 28, 2022

B5071803.9