UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ------------------------------------------------------- x | |
| In re | : Chapter 11<br>:<br>: Case No.19-10747 (SHL)<br>: |
| Jeffrey Lew Liddle, | : Jointly Administered with Case No. 19-12346 (SHL) |
| Debtor. | : Related Doc. 249, 250 and 257 |
| ------------------------------------------------------- x | |
| ------------------------------------------------------- x | |
| In re | : Chapter 11<br>:<br>: Case No. 19-12346 (SHL) |
| LIDDLE & ROBINSON, L.L.P.,[1] | : Jointly Administered with Case No. 19-<br>: 10747 (SHL) |
| Debtor. | : Related Doc. 103, 130, and 155 |
| ------------------------------------------------------- x | |

**DECLARATION OF ALLEN WILEN IN SUPPORT OF: (1) OMNIBUS OBJECTION BY DEBTOR LIDDLE & ROBINSON, L.L.P TO: (A) MOTION BY COUNSEL FINANCIAL II LLC, LIG CAPITAL LLC, AND COUNSEL FINANCIAL HOLDINGS LLC, PURSUANT TO § 1112(b) OF THE BANKRUPTCY CODE, TO CONVERT THIS CHAPTER 11 TO A CHAPTER 7, (B) MOTION BY BLAINE H. BORTNICK PURSUANT TO SECTION 1112(b) OF THE BANKRUPTCY CODE, TO CONVERT THIS CHAPTER 11 REORGANIZATION TO A CHAPTER 7 LIQUIDATION AND (C) UNITED STATES TRUSTEE'S MOTION: (I) PURSUANT TO 11 U.S.C. § 1112, FOR CONVERSION OF THE CORPORATE CASE TO A CASE UNDER CHAPTER 7, OR IN THE ALTERNATIVE, (II) PURSUANT TO 11 U.S.C. § 1104, FOR APPOINTMENT OF A CHAPTER 11 TRUSTEE; AND
(2) OBJECTION BY DEBTOR JEFFREY LEW LIDDLE TO (I) MOTION BY COUNSEL FINANCIAL II LLC, LIG CAPITAL LLC, AND COUNSEL FINANCIAL HOLDINGS LLC, PURSUANT TO § 1112(b) OF THE BANKRUPTCY CODE, TO <u>CONVERT THIS CHAPTER 11 TO A CHAPTER 7 LIQUIDATION</u>**

I, Allen Wilen, hereby declare under penalty of perjury that the following is true to the best of my knowledge, information and belief:

---

[1] The last four digits of the Firm Debtor's taxpayer identification number are 6440.

**Summary**

1.  I am a Certified Public Accountant that is Certified in Financial Forensics, a Certified Insolvency and Restructuring Advisor, a Chartered Financial Analyst, a Certified Turnaround Professional and an INSOL Fellow and a Partner of EisnerAmper, LLP ("EisnerAmper"), Accountants and Consultants, which maintains offices at 750 Third Avenue, New York, New York 10017. On July 23, 2019, EisnerAmper was retained *nunc pro tunc* to April 26, 2019 as Accountants to Jeffrey Lew Liddle (the "Individual Debtor") [19-10747 ECF No. 138] and, on September 4, 2019, EisnerAmper was retained *nunc pro tunc* to July 22, 2019 (the "Firm Petition Date") [19-12346 ECF No. 47] as Accountants to Liddle & Robinson, L.L.P. (the "Firm Debtor" or the "Firm" and, together with the Individual Debtor, the "Debtors") in their Chapter 11 cases pending before this court (the "Chapter 11 Cases"). As such, I am fully familiar with the facts and circumstances as set forth herein.

2.  I submit this Declaration in support of (1) the Firm Debtor's *Omnibus Objection To (A) Motion by Counsel Financial II LLC, LIG Capital LLC, and Counsel Financial Holdings LLC, Pursuant to § 1112(b) of the Bankruptcy Code, to Convert This Chapter 11 to a Chapter 7, (B) Motion by Blaine H. Bortnick Pursuant to Section 1112(b) of the Bankruptcy Code to Convert this chapter 11 Reorganization to a Chapter 7 Liquidation, and (C) United States Trustee's Motion (I) Pursuant to 11 U.S.C. § 1112 for Conversion of the Corporate Case to a Case Under Chapter 7 or in the Alternative (II) Pursuant to 11 U.S.C. § 1104, for Appointment of a Chapter 11 Trustee* (the "Firm Objection") and (2) the Individual Debtor's *Objection to (I) Motion by Counsel Financial II, LLC, LIG Capital LLC, and Counsel Financial Holdings LLC, Pursuant to § 1112*

2

*of the Bankruptcy Code, to Convert This Chapter 11 to a Chapter 7 Liquidation* (the "Individual Objection" and, together with the Firm Objection, the "Objections").[2]

*3.* In preparing this Declaration, I reviewed the promissory notes, those statements issued to the Firm by Counsel Financial II, LLC ("CFII"), LIG Capital, LLC ("LIG") and Counsel Financial Holdings, LLC ("CF Holdings" and, collectively with CFII and LIG, "Counsel Financial"), memoranda prepared by the Debtors, the proofs of claim filed in the Chapter 11 Cases, the Debtors' Monthly Operating Reports, and several discussions with Mr. Liddle about the history of the transactions. I also consulted with my colleagues at EisnerAmper who have been providing services to the Debtors in the Chapter 11 Cases, as well as with attorneys at Foley Hoag, LLP ("Foley Hoag"), counsel to the Debtors in the Chapter 11 Cases.

*4.* As set forth more fully in the *Affidavit of Jeffrey L. Liddle in Opposition to the Conversion Motions,* filed contemporaneously herewith, the relationship between the Counsel Financial entities and the Firm is more akin to an investment and loan-to-own relationship than a lending relationship. Notwithstanding that each of the Notes (as defined below) was styled as a loan document on its face, the terms and conduct of the parties demonstrate that the transactions are more like equity than debt.

---

[2] The *(A) Motion by Counsel Financial II LLC, LIG Capital LLC, and Counsel Financial Holdings LLC, Pursuant to § 1112(b) of the Bankruptcy Code, to Convert This Chapter 11 to a Chapter 7* [19-12346 ECF No. 103], *(B) Motion by Blaine H. Bortnick Pursuant to Section 1112(b) of the Bankruptcy Code to Convert This Chapter 11 Reorganization to a Chapter Liquidation* [19-12345 ECF No. 130]*, and (C) United States Trustee's Motion (I) Pursuant to 11 U.S.C. § 1112 for Conversion of the Corporate Case to a Case Under Chapter 7 or in the Alternative (II) Pursuant to 11 U.S.C. § 1104, for Appointment of a Chapter 11 Trustee* [19-10747 ECF No. 257] shall be collectively referred to herein as the "Firm Conversion Motions") and the *Motion by Counsel Financial II, LLC, LIG Capital LLC, and Counsel Financial Holdings LLC, Pursuant to § 1112 of the Bankruptcy Code, to Convert This Chapter 11 to a Chapter 7 Liquidation* [19-10747 ECF No. 249] shall be referred to herein as the "Individual Conversion Motion" and, together with the Firm Conversion Motions, the "Conversion Motions").

3

**The Counsel Financial Notes**

5.      The three Counsel Financial entities are investors in the Firm pursuant to three Notes (as defined below) issued between August 2016 and June 2017. On August 5, 2016, the Firm entered into a Revolving Promissory Note (the "CFII Note"). The CFII Note originally provided for a maximum principal amount of $6,000,000, but the available credit under the CFII Note was reduced to $5,500,000 by an allonge dated October 13, 2016 and increased again pursuant to an allonge dated December 21, 2016.[3] The CFII Note was personally guaranteed by Mr. Liddle pursuant to the Guaranty of Payment and Performance and secured by a Security Agreement, each dated August 5, 2016. Each of Blaine H. Bortnick, James Ryan Hubbard, and Christine A. Palmieri, now former partners of the Firm, also executed the CFII Note, Guaranty, and Security Agreement.

6.      On October 13, 2016, the Firm entered into a Term Promissory Note with LIG (the "LIG Note"). The LIG Note provided for a maximum principal amount of $1,500,000, and was personally guaranteed by Mr. Liddle pursuant to the Guaranty of Payment and Performance and secured by a Security Agreement, each dated October 13, 2016.

7.      On June 2, 2017, the Firm entered into a Revolving Promissory Note with CF Holdings (the "CF Holdings Note" and, collectively with the CFII Note and LIG Note, the "Notes"). The CF Holdings Note provided for a maximum principal amount of $1,000,000, and was personally guaranteed by Mr. Liddle pursuant to the Guaranty of Payment and Performance and secured by a Security Agreement, each dated June 2, 2017. By a statement issued on May 31,

---

[3] The $100,000 line was initially charged at a different interest rate and later collapsed into the CFII Note in June 2018.

2018, Counsel Financial represented that the "Total Line of Credit" under the CF Holdings Note was $1,775,000. I understand that this increase was neither requested nor authorized by the Firm, and there is no documentation whereby the maximum principal amount was increased by $775,000.

8.      Between August 2016 and June 2017, Counsel Financial made several infusions of funds into the Firm under the terms of the Notes and secured by the Firm's contingency fee revenues and other assets. Additionally, Counsel Financial made a series of transfers between the Counsel Financial entities, in each case ostensibly "lending" to the Firm under one Note and paying the "loan proceeds" directly to another Counsel Financial entity on account of principal and/or interest due under a previous Note. It is my understanding that none of these intra-Counsel Financial transfers were requested or authorized by the Firm.

### Advances Made Under the Notes

9.      Of the $8.1[4] million in principal amount authorized by the Notes, very little was actually funded to the Firm to finance its operating expenses. However, over $1.4 million was paid directly between Counsel Financial entities—without authorization from the Firm—to pay down principal and interest and fund returns to prior Counsel Financial investors.

10.     As noted above, the CFII Note provided for a maximum principal amount of $5.6 million (after accounting for CFII's reduction of the original maximum available principal amount of $6 million). On August 11, 2016, CFII advanced $1.1 million to Mr. Liddle for payment of his personal tax liability. On August 8, 2016, $3.4 million was advanced to Signature Bank to satisfy

---

[4] On October 21, 2016, CFII reduced the maximum principal amount available under the CFII Note to $5.5 million from $6.0 million.

the Firm's existing debt. Between August 18, 2016 and January 19, 2017, approximately $1.7 million was advanced to the Firm to satisfy working capital needs.

11. The LIG Note was issued in the face amount of $1.5 million; LIG required that it be fully drawn at inception. However, only $465,000 was actually funded to the Firm, on October 31, 2016. There were then three advances made without the Debtors' authorization on October 18, 19 and 21, 2016 in the amounts of $500,000, $300,000 and $175,000 respectively[5]. These amounts according to the LIG Capital statements were used to reduce the principal balance under the CFII Notes. In addition, certain client fees were paid directly to LIG without authorization from the Debtors. The Debtors had no input with regard to the application of the fees. In December 2017, approximately $931,000 in client fees were used to reduce the principal amount outstanding under the LIG Note and to make an interest payment. This occurred again in November 2018, when LIG applied $172,000 in client fee payments to satisfy principal and interest payments under the LIG Note. The terms of the Security Agreement governing the LIG Note (the "LIG Security Agreement") permitted LIG to pursue collections directly from clients (*see* section 4(c) of the LIG Security Agreement), but only *after* an Event of Default (as defined therein) shall have occurred. LIG did not provide any default notice to the Firm or to Mr. Liddle prior to collecting fees directly from clients in satisfaction of amounts due under the LIG Note. Instead, as I understand from Mr. Liddle, Counsel Financial sent letters dated November 16, 2017 and November 2, 2018 directly to

---

[5] Based upon discussions with Mr. Liddle, these amounts were not requested. Typically, an advance request of a working capital lender is made in writing, whether via a formal draw request or at a minimum via an email request. The CFII Note and CF Holdings Note each expressly contemplated that the Firm would make "Loan Requests" identifying the principal amount of the request, the purpose of the loan, and the business day on which the loan is requested to be made (*see* section 3(a)). Nonetheless, Counsel Financial did not await receipt of a Loan Request to advance funds to itself to repay its investors.

account debtors of the Firm notifying the recipients that defaults had occurred and seeking payment of the Firm's fees directly to Counsel Financial.

12.     Between June 2 and 20, 2017, a total of $226,840 was advanced to the Firm under the CF Holdings Note to fund its working capital needs; the Firm received an advance of $186,810 on June 2, 2017 and $40,030 on June 20, 2017. Neither the Firm nor Mr. Liddle authorized any subsequent advances under the CF Holdings Note. However, between June 15, 2017 and January 23, 2018, approximately $510,000 was ostensibly "borrowed" under the CF Holdings Note and paid from CF Holdings directly to LIG and/or CFII toward interest accrued under the respective Notes. Of the $1.7 million purported amount funded between June 2, 2017 and January 23, 2018, only $226,840 was either authorized by or paid to the Firm.

13.     Notwithstanding the relatively scant amounts actually funded to the Firm pursuant to the Notes, Counsel Financial has charged above-market interest on amounts that (i) exceed the maximum principal amounts authorized by the Notes, (ii) were not authorized by the Firm or Mr. Liddle, and (iii) were never even funded to the Firm. As a result, CFII has asserted a total claim against the Firm of $6,541,924.84 [Claim 17-1]. LIG has asserted in its proof of claim total liabilities of the Firm under the LIG Note in the amount of $539,007.41 [Claim 18-1], notwithstanding that only $465,000 was authorized by or funded to the Firm. And CF Holdings filed a proof of claim against the Firm in the amount of $2,157,142.12 [Claim 19-1], an amount that both exceeds the maximum principal amount permitted by the CF Holdings Note by over $1,000,000 and includes over $1.5 million in unauthorized principal draws used by CF Holdings for payments to LIG and/or CFII on account of amounts due under their respective Notes.

14.     In total across the three Notes, the Counsel Financial entities only directly advanced approximately $7.0 million to the Debtors to (i) fund working capital to the Firm in the aggregate

7

amount of $2.5 million, (ii) $1.1 million to fund Mr. Liddle's personal tax liability, and (iii) $3.4 million to fund the repayment of the firm's prior debt to Signature Bank, markedly less than the aggregate $9,238,086.37 asserted in their proofs of claim. Together, LIG and CF Holdings made a total of approximately $1.5 million in unauthorized advances under the LIG Note and CF Holdings Note directly to other Counsel Financial entities, none of which was ever received by the Firm or Mr. Liddle, but on the entirety of which above-market interest has been accruing and charged to the Firm.

### Counsel Financial's Asserted Claims Against the Debtors

15. Relying on these capital investments and transfers among the Counsel Financial entities, Counsel Financial has presented itself in the Chapter 11 Cases as the largest secured creditor of both Debtors. The Counsel Financial entities have filed three proofs of claim against the Firm Debtor asserting liabilities of $9,238,086.37 in the aggregate (the "Claim"), an amount that not only exceeds the maximum aggregate principal amount permitted by the Notes by more than $1,000,000, but also grossly exceeds the amount of funds actually requested by and advanced to the Firm to fund its operating expenses. Based on my analysis of the Notes documentation, loan statements issued thereunder and transaction history between the Debtors and the Counsel Financial entities, and as I understand from discussions with Foley Hoag, Counsel Financial has not sufficiently demonstrated that the Claim represents validly issued debt under legitimate loan agreements.

16. As a result, both the nature and extent of Counsel Financial's claims or interests against the Firm—indeed, its very legitimacy as a creditor—remain in question. And yet, its Claim and the Conversion Motions represent real threats to the prospect of an orderly liquidation of the Firm for the benefit of all legitimate creditors as its Claim dwarfs those of other creditors  Counsel

8

Financial is tantamount to an equity investor that has made capital infusions for its own benefit and the benefit of its investors pursuant to a series of agreements (i) that are absent many indicia of traditional lending arrangements or (ii) pursuant to which Counsel Financial has blatantly disregarded or breached the few loan formalities that do exist. It appears that this is an attempt to get around the absolute priority rule, and at worst a Ponzi-like scheme whose claims should be equitably subordinated to the Firm's other creditors.

### Interest Charged on The Notes

17.    In addition to drawing the Notes at times and in amounts not authorized by the Debtors, and "lending" above the maximum principal amount in the case of the CF Holdings Note, Counsel Financial charged interest on the outstanding principal amounts at rates substantially higher than provided for in the underlying agreements and far in excess of market rates for commercial lending. In the case of the CF Holdings Note, the actual interest charged based on the authorized advances received in the amount of $226,840 peaked at an annualized rate of 148.71% in February 2019. Further, if we include the $30,000 closing fees paid in June 2017, the annualized all-in-rate for the month of June is in excess of 207% based on the principal amounts authorized and funded to the Debtor ($226,840). These rates far exceed the 18.0% plus LIBOR in excess of 1.0% as stated in the CF Holdings Note.

18.    In the case of the CF Holdings Note, Counsel Financial was calculating interest on amounts which included more than $1.5 million in unauthorized principal draws used to fund payments under the CFII Note and LIG Note. The Firm has had no choice but to accrue interest amounts based on interest rates grossly exceeding what was agreed to in the CF Holdings Note (and what a reasonable commercial borrower could expect) on amounts it did not even borrow.

**The Individual Conversion Motion**

19. Counsel Financial is also using its purported position as Mr. Liddle's largest secured creditor (by virtue of his guarantees of the Notes) to seek to convert the individual case to chapter 7, asserting that the worsening financial condition of Mr. Liddle's estate, coupled with his lack of individual income, warrants conversion of the Individual Debtor's case. First, Counsel Financial has argued that Mr. Liddle's monthly income, comprised of his $15,000 monthly draw from the Firm and Social Security payment, is insufficient to cover his expenses. Counsel Financial's argument is at odds with the fundamental accounting premise that a draw is not, by definition, income. Rather, it is an advance against Mr. Liddle's capital account with the Firm. Indeed, he would not be taxed on his monthly draw as his income is deemed to be $0 for tax purposes until year end, at which point the Firm's profit (and Mr. Liddle's income from the Firm) could be determined. Second, Counsel Financial has argued that the individual estate is suffering substantial and continuing losses with no hope for rehabilitation. However, Mr. Liddle's income is tied inextricably to the success of the Firm. As can be seen from the Firm's October 2019 Monthly Operating Report, the Net Operating Income before restructuring expenses was $1.9 million for the month, and $1.7 million on a cumulative basis since the Firm Petition Date. At the end of November 2019, the Firm Debtor had approximately $1.5 million in cash in its bank account and is projecting to collect an additional $1.3 million in client fee payments by the end of the year. The Firm's cash collections are more than double the amounts that were included in the budget. The Firm Debtor's cash flow budget estimated cash collections of approximately $860,000 from the Firm Petition Date to the end of October, while actual collections came in significantly better at approximately $2.0 million. In addition, Firm expenses have consistently tracked below the budget.

20.     As the foregoing illustrates, the Firm's performance is improving under the management of Mr. Liddle. He is taking illiquid assets—the Firm Debtor's cases—and turning them into liquid assets as a result of his numerous litigation successes.

### Counsel Financial Business Model and Investors

21.     Counsel Financial is a non-bank commercial lender that offers loans and credit lines to law firms with revenues from contingency fee practices. According to its website, it provides "working capital" to "finance" law firm practices.[6] It touts its many "advantages over other lenders," including offering significantly more capital than banks, with proceeds available for "any law firm purpose" and flexible repayment terms. However, unlike traditional commercial lenders that loan money for the purpose of funding working capital, in its relationship with the Firm Counsel Financial actually operated as a series of investment vehicles that directed advances both to the Firm and to other Counsel Financial entities to fund payouts to investors—charging above-market interest rates which equate with equity level returns versus those received on debt.

22.     In the case of the Firm, three entities "lent" money: CFII, LIG, and CF Holdings. Each of these entities has different financial backing. For example, it has been represented to us that CFII is financially backed by Bank of America, that LIG is backed by a group of passive, outside investors, and that CF Holdings is backed by Counsel Financial insiders. Certain public information has confirmed that the former disgraced speaker of the New York State Assembly, Sheldon Silver, and his family have reportedly invested over $1,000,000 in an affiliate of CFII, LIG, and CF Holdings.

---

[6] www.counselfinancial.com

23. I believe that issuing "loans" from discrete entities backed by separate and discrete investor groups both permits and incents Counsel Financial to prioritize repayment of its own investors over providing working capital to its clients. By way of example, an initial group of investors in a particular entity may and can be paid from funds subsequently advanced by a separate entity backed by a different investor group. This structure was expressly contemplated by—and incorporated into the documentation for—Counsel Financial's relationship with the Firm. Notwithstanding the nature of Mr. Liddle's agreement-in-principle with LIG to borrow amounts for working capital purposes, the LIG Note expressly provided that the Loan was for the "sole purpose of repaying [the Firm's] debt to [CFII]." Similarly, the CF Holdings Note expressly provided that $500,000 of the Loan was intended "to fund monthly interest payments on in the indebtedness of [the Firm] to [CFII] and LIG." *See* LIG Note and CF Holdings Note, section 3(b). It should be noted that this structure (i.e. new investor funds being used to payoff prior investors) is used in Ponzi-like schemes.

24. Each of the LIG Note and CF Holdings Note expressly contemplated that proceeds would be used to repay debt owed to CFII and to LIG. The CF Holdings Note also contemplated that the decision whether to honor a loan request would be in the sole discretion of CF Holdings. None of the Notes, however, contemplated that amounts could be paid directly to other Counsel Financial entities without the request or authorization of the Firm. Although loan proceeds are commonly used to pay down existing debt, in my experience it is not market lending practice to fund debt payoff absent the request or authorization of the borrower. That CFII, LIG, and CF Holdings are affiliated entities, under common control but backed by separate investors anticipating returns on different timelines, makes the propriety of Counsel Financial's actions particularly questionable.

25.  Had the Notes truly been intended to provide working capital to the firm, there is no reason that the first CFII Note would not have been amended to increase the maximum principal amount available. I believe that the issuance of the LIG Note was more likely driven by the need to pay the CFII investors.

26.  Despite its holding itself out to the public as a lender that provides "working capital to finance all major areas" of contingent fee law firm practice, in the case of the Firm, Counsel Financial provided very little working capital. Counsel Financial's business model, from the structure of its purported loan agreements to its conduct in administering the "loans", more closely resembles a Ponzi-like scheme than a working capital lender.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: December 13, 2019

*[signature]*
_____
Allen Wilen
Partner, EisnerAmper LLP