**DAVIDOFF HUTCHER & CITRON LLP**
605 Third Avenue
New York, New York 10158
212.557.7200 (tel)
David H. Wander, Esq. (dhw@dhclegal.com)
Alexander R. Tiktin, Esq. (art@dhclegal.com)

*Attorneys for Counsel Financial II LLC,*
*LIG Capital LLC, and Counsel Financial Holdings LLC*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------X
In re:                                                           :    Chapter 11
                                                                 :
JEFFREY LEW LIDDLE,                          :    Case No. 19-10747 (SHL)
                                                                 :    (Jointly Administered
                                      Debtor.            :    with Case No. 19-12346)
---------------------------------------------------------X  Related Doc. 103 and 163


---------------------------------------------------------X
In re:                                                           :    Chapter 11
                                                                 :
LIDDLE & ROBINSON, L.L.P.,                 :    Case No.19-12346(SHL)
                                                                 :    (Jointly Administered
                                                                 :    with Case No. 19-12346)
                                      Debtor.            :    Related Doc. 249, 250 and 263
---------------------------------------------------------X


**REPLY BY COUNSEL FINANCIAL II LLC, LIG CAPITAL LLC, AND**
**COUNSEL FINANCIAL HOLDINGS LLC, IN FURTHER SUPPORT OF**
**THEIR MOTIONS TO CONVERT DEBTORS' CHAPTER 11**
**REORGANIZATIONS TO CHAPTER 7 LIQUIDATIONS**

TO THE HONORABLE SEAN H. LANE,
UNITED STATES BANKRUPTCY JUDGE:

Counsel Financial II LLC ("CF2"), LIG Capital LLC ("LIG"), and Counsel Financial

Holdings LLC ("Holdings" and together with CF2 and LIG, "Counsel Financial" or "Movant"),

by their attorneys, Davidoff Hutcher & Citron LLP, submit this reply in further support of its

674457v4

motions, pursuant to § 1112(b) of the Bankruptcy Code, to convert these chapter 11 reorganizations to chapter 7 liquidations, and represent and state as follows:

## PRELIMINARY STATEMENT

1.      Debtors answering papers to this motion fail both as a matter of law and fact.

2.      Debtors mistakenly believe that if they go on the offensive and attack Movant with false and scurrilous allegations then this Court will take a negative view towards Counsel Financial and deny it the relief to which it is otherwise entitled. In an attempt to cast Movant in an unfavorable light, Liddle tosses around such highly prejudicial terms such as "loan to own," "Ponzi scheme" and "recharacterize debt to equity."  These tactics should be summarily rejected since not only is there no proof to any of these claims, but rather they are demonstrably false. As we will show, Movant is a longstanding and well-established firm with an impeccable reputation who has always acted in a proper manner.  And any legal issues Debtors raise are similarly either barred or irrelevant.

3.      Moreover, Liddle's attempt to impugn and malign the efforts Counsel Financial took to save his firm is analogous to the man who complains he doesn't like the color of the lifebuoy the Coast Guard threw him when his boat was sinking.

4.      The identical affidavits submitted by Jeffrey L. Liddle sworn to December 11, 2019 in opposition to the conversion motions [*Doc 163-2; 263-1* (the "Liddle Affidavit")] is nothing more than pure fiction. While it presents a nicely written story based on outlandish claims, it should be rejected in its entirety because it has no basis in reality.  This attempt to demonize and slander Movant is reprehensible, particularly since there is no support for any of these scandalous statements.

5.      Because Counsel Financial is under attack and its otherwise impeccable reputation is a risk, it has no choice but to respond to each and every false allegation asserted.  When completed, this Court will see there is no substance to any of Liddle's arguments and Counsel Financial's request for relief should be granted in its entirety.

**Res Judicata**

6.      Most importantly, Liddle is precluded from even raising the substantive allegations in his opposition to conversion. All of these issues, including the validity of the CFII loan, the amount owed, and the question of usury were raised and rejected by the Supreme Court of the State of New York, in and for the County of Erie (Judge Deborah Chimes) in connection with Counsel Financial's motion for summary judgment. *See Counsel Financial II LLC v. Liddle & Robinson LLP, Jeffrey L. Liddle, Blaine H. Bortnick, and James Ryan Hubbard*, Index. No. 814703/2018 (the "State Court Action").  Indeed, in January 2018, Liddle himself submitted to Judge Chimes his own executed stipulation admitting that the amount of the consolidated debt owed to Counsel Financial was approximately $7,791,448.08 and was undisputed! *See Wander Dec., Exh. C.*

7.      After having had the full opportunity to raise and be heard on these arguments, Liddle is now estopped from relitigating the same claims in this court based on the doctrine of res judicata. Res judicata bars later litigation of a cause of action if an earlier decision was (1) a final judgment on the merits, (2) by court of competent jurisdiction, (3) in a case involving the same parties or their privies, and (4) involving the same cause of action. *In re HS 45 John LLC*, 585 B.R. 64, 77 (Bankr. S.D.N.Y. 2018). Furthermore, res judicata precludes claims that *could have*

*been* brought in a prior action. *Indosuez Int'l Fin., B.V. v. Nat'l Reserve Bank*, 304 A.D.2d 429, 430, 758 N.Y.S.2d 308, 310 (2003).

8.      First, the State Court Action concluded with a final judgment on the merits in favor of Counsel Financial and against Liddle. Liddle had a full and fair opportunity to raise all the claims that he now raises here. Many of the claims now being asserted were actually brought in the State Court Action, including Liddle's claims contesting the validity of the loans, their amount, and the question of usury. *See Liddle Memorandum of Law, Wander Dec., Exh. A.* The state court rejected these claims and held in favor of Counsel Financial on summary judgment. *See Order and Judgment Entered Against Defendants Liddle & Robinson LLP and Jeffrey L. Liddle in the State Court Action, Wander Dec., Exh. A.* Liddle should not be permitted to use this forum to relitigate claims that he already litigated and lost in the State Court Action.

**Response to Liddle's unsupported, self-serving statements**

9.      Liddle's opening statement sets forth the basis of his argument.  He claims that "[t]he relief sought in the Conversion Motions is not in the best interest of creditors, the estates in the individual and firm Chapter 11 cases, or other parties with interests in these Chapter 11 estates, *particularly the clients of Liddle & Robinson*," *Liddle Affidavit, Doc 163-2; 263-1* (emphasis added). This is a false premise. First, Liddle easily can and should form a new firm, e.g. "Liddle and Associates, P.C.," and transfer all of L&R's existing cases to that firm.  Not only will that avoid any prejudice to L&R's clients, it is the most important step to wind down L&R.[1]

10.     Second, any legitimate claims that Liddle and L&R have, whether it be against Counsel Financial or any of the numerous other people and entities listed on the Debtors'

---

[1] *Counsel Financial would have no objection to a short delay in the effectiveness of an order converting L&R's chapter 11 case, e.g. 7-10 days, so that all of the cases can be transferred to a new firm managed by Liddle.*

schedules of assets as being targets of the Debtors' claims, will be preserved for the benefit of the Debtors' estate and can be prosecuted by a trustee if they have merit.[2]  This outcome will avoid the extraordinary expense of permitting Liddle to saddle both estates with the expense of pursuing baseless claims.

11.     Liddle's allegation of "a three-year campaign by Counsel Financial to exercise control and ownership over Liddle & Robinson's practice, clients, and cases for its exclusive benefit" (*id. at ¶2*) must be rejected as illogical, if for no other reason. No lender, whether it be Counsel Financial or Goldman Sachs or JP Morgan Chase, can ever "control" a law firm or its clients. In fact, a law firm cannot even "control" its clients, as a matter of law. The client always controls his own destiny.  Only a lawyer who has a client's confidence and loyalty can ever truly influence a client.  Thus, Liddle, with the client's consent, can move L&R's cases to any firm at any time, including to his own.[3]

12.     Liddle's claim that "the law practice is succeeding and the Debtors will be in a position to propose a viable plan with a substantial distribution to legitimate creditors in early 2020," (*id. at ¶3*), is nothing more than a self-serving conclusion and wishful thinking. Moreover, a review of the Debtor's current list of cases shows it to be a shell of what the firm was only a few years ago.

---

[2] Obviously, Movant does not believe that any of the claims against it have any merit.

[3] Further, Liddle's former partner, James R. Hubbard, Esq., has attested to the complete control and dominion that Liddle exercised over the firm as its managing partner:

> In his capacity as the managing partner of L&R, Liddle ran the Firm to the exclusion of his "partners." In fact, Liddle made virtually every significant business and financial decision concerning the Firm's business and finances without consulting his partners.

*Affidavit of James Ryan Hubbard, Esq. dated January 24, 2019, case no. 19-10747, Doc. 250, Exh. A.*

13.     No such confirmable plan can ever be filed, especially not in early 2020.  To date, there is not even a bar date for the filing of claims in either chapter 11 case.  Notably, it was only in response to the motions to convert, and nine months after the commencement of Liddle's chapter 11 case, that the Debtors even applied for a claims bar date.  No objection has ever been filed to any of the three Counsel Financial proofs of claim.  Furthermore, any effort to recharacterize debt to equity would require the filing of a motion, extensive discovery and a trial.  "The doctrine of equitable subordination is considered an extraordinary remedy that is to be used sparingly."  *In re: Aéropostale, Inc.,* 555 B.R. 369, 397 (Bankr. S.D.N.Y. 2016) (quoting *Kalisch v. Maple Trade Fin. Co.* (*In re Kalisch*), 413 B.R. 115, 133 (Bankr.S.D.N.Y.2008)).  Thus, the idea that a confirmable plan can soon be filed is obviously a fantasy.

14.     While Liddle touts the fact that "Liddle & Robinson will generate over $3.5 million in fee income this quarter," *id.* at ¶4, he ignores all of the lean months in 2019, when it failed to collect any significant fees.  Liddle also ignores the undeniable fact that all of these fees are Counsel Financial's cash collateral which L&R cannot use to fund a plan unless the funds are used to pay down Counsel Financial's secured claim of more than $9 million.  In that case there would be little, if any, funds available for distribution to other creditors. "The fee income was generated from judgments, arbitration awards, settlements, and hourly fee cases." *Id.*

15.     While Liddle in ¶4 also touts the fact that L&R "has opened approximately two dozen new matters since the inception of these Chapter 11 cases" and that "s]ix new cases have been filed or are soon to be filed," these admissions actually work against him.  Indeed this fact mandates that the Court convert L&R's chapter 11 since it obviously is not winding down but, rather, trying to reorganize in chapter 11.  "Here, Liddle & Robinson is … obtaining new

business, and filing new cases. There is a valuable active law practice that should be sustained in Chapter 11…." *Id.* This flies in the face of established law in this circuit, as well as applicable state law, which requires a partnership in dissolution to wind down and not reorganize under chapter 11. Incredibly, Liddle glosses over the fact that L&R is signing up new clients and mischaracterizes his conduct as "operat[ing] the business during the dissolution process." *Id. at 7.* Signing up new clients and filing new cases is not a wind down!

16.     Liddle's concern about the "[t]rauma of a Chapter 7 conversion or appointment of a Chapter 11 trustee," (*id. at 9*), is baseless because, as he admits, "[t]he clients are free to select new counsel." *Id. at 10.* In other words, nothing is keeping Liddle from starting a new firm and having all of L&R's client's select his new firm as substitute counsel. "The Liddle & Robinson practice has stayed intact based on my reputation, my relationship to clients…." *Id.*

17.     In trying to justify L&R's filing of a chapter 11 petition *to reorganize*, Liddle blames everyone – the Court, the Office of the United States Trustee, the Kasowitz Benson firm, and Counsel Financial - but himself. *Id. at 14-15.* The truth is that Counsel Financial alerted Liddle, as well as his counsel, that a bankruptcy filing for L&R was unnecessary because the automatic stay that arose in Liddle's individual bankruptcy already protected that entity. *See case no. 19-10747-shl, doc. 23; See Residential Capital, LLC v. Federal Housing Finance Agency,* 2013 WL 4056195, August 12, 2013, *1 (S.D.N.Y. 2013); *see also Queenie, Ltd. v. Nygard Int'l,* 321 F.3d 282 (2d Cir. 2003) (holding that the automatic stay applied to a non-debtor because the non-debtor was wholly owned by the Debtor, and adjudication of a claim against the non-debtor would have an immediate adverse impact on the debtor's estate). No one told Liddle to "reorganize" L&R under chapter 11.

18. The filing of a feasible plan "based on recent settlements and trial successes, and a pipeline of approximately six cases scheduled or expected to be tried in the first half of 2020" is nothing more than "hope," as Liddle admits. *Liddle Affidavit at ¶16* ("it is my firm hope that Liddle & Robinson will be in a position to confirm a chapter 11 plan with a substantial distribution to all the estates' legitimate creditors."). While "hope" for Liddle may spring eternal, it is not enough to establish feasibility of a plan. Moreover, all of these recent settlements and trial successes are Counsel Financial's cash collateral.

19. Liddle's statements labeled "Recharacterization, Equitable Subordination, and Lender Liability," (*id. at ¶¶ 19-23*), have no factual support other than Liddle's self-serving, conclusory statements. Liddle has offered absolutely no evidence of the typical indicia of "control" such as signatories to bank accounts, authority to choose which creditors get paid and which do not, power to hire and fire and so on. He further fails to explain how Counsel Financial *caused all of his partners to walk out on him and the practice* which is the primary reason the law firm has failed.

20. Liddle's attempt to impugn the legitimacy of Counsel Financial as creditors, by mischaracterizing them as "investors who take speculative interests in contingency fee cases," (*Id. at 19*) is absolutely meritless. His statements about Counsel Financial and its relationship with L&R are simply incredible and should be given no credence because, aside from being unsupported, they defy common sense and logic. He argues:

- "The Counsel Financial Entities have acted as owners or partners with a controlling interest in Liddle & Robinson from day one of their relation with the Firm in the Summer of 2016.

- For over three years, the Counsel Financial Entities has been engaged in a 'loan to own' strategy focused on controlling Liddle & Robinson's cases for their own benefit, or for the benefit of other firms under their control.

- The Counsel Financial Entities effectively insinuated themselves into a managing partner function at Liddle & Robinson.

- Counsel Financial constantly used its position to assert dominion over every aspect of the financing and operations of Liddle & Robinson.

*Id.* None of these allegations are supported by anything other than Liddle's self-serving and conclusory statements. Notably, not a single document has been produced by Liddle to support any of these ridiculous 'statements.' They are baseless.

21.     Liddle's unsupported statement that "[o]n four occasions Counsel Financial attempted to force the transfer of Liddle & Robinson's cases to other firms, including three times to Milbert LLP ("Milberg"), (*id. at 20*), is misleading at best. When Counsel Financial recognized L&R was in dire straits, it tried to assist Liddle in relocating his practice to another firm. *See Philips Declaration at ¶4-7.* Liddle, himself, sabotaged this process as attested to by the supporting affidavits of Glenn Phillips, Esq., Managing Partner of Milberg, Phillips, Grossman and Richard Silverstein, who was involved in the Pierce Bainbridge debacle, as well as the documentary evidence consisting of an email from a Pierce Bainbridge partner. *See id.; Wander Dec., Exh. D.*

22.     Liddle's unsupported statement that "[o]n at least three other occasions, Counsel Financial thwarted financing arrangements [Liddle] had negotiated with other unrelated parties," (*id. at 21*) is more fictional. Once again, Liddle is blaming others for his own failures. Nothing would have been better for Counsel Financial at that time if another lender had paid off its outstanding loans. Since, L&R had already defaulted on his firm's prior financing with Signature

Bank and was then in default on Counsel Financial's loans – all of which was a matter of public record including the existence of numerous other actions against the firm including an eviction proceeding by L&R's landlord -- his firm had become 'damaged goods.' Liddle's unsupported contention that Counsel Financial "reduced Liddle & Robinson … to a vassal state to be manipulated for the benefit of their various pools of investors," *id at 21*, is belied by the sworn statements of his former partners who blame Liddle's lavish lifestyle for the downfall of L&R. *See CF Motion to Convert, Doc. 249 at ¶¶ 17-20.*

23.     Liddle's self-serving "analysis" of Counsel Financial's business model, resulting in his "inexorable conclusion" that their loans "should be recharacterized as equity and extinguished under a plan, and any residual claims should be equitably subordinated," (*Liddle Affidavit* at ¶22), simply ignores applicable law and the fact intensive showing that must be made, as shown by this Court's decision in *Aeropostale* (discussed below). Liddle has the audacity to call Counsel Financial "a lender in name only," even though it is undisputed that his firm received an initial loan of $6 million which, as Liddle admits, included $3,420,000 to pay off the firm's <u>existing</u> lender, Signature Bank, and approximately $1,100,000 went to the IRS. "I don't dispute that the initial loan included an amount of approximately $1.1 million to pay a personal tax debt." *Id. at 25*. The fact that, "[a]fter reserves were established, under $1,000,000 was ever available for working capital," (*id. at 24*), is no reason to fault Counsel Financial.

24.     Liddle's comments about the source of funds for the second loan, (*id. at ¶26*), which was made by LIG, is simply irrelevant. Whether the funds were obtained by LIG from Bank of America or non-institutional investors, (*see id. at 26*), it is undisputed that Liddle signed all of the loan documents both on behalf of his firm and individually, Liddle approved the

allocation of funds, and the funds that LIG agreed to provide were, in fact, provided in the exact amounts provided for under the loan documents.  *See Declaration of Megan Payne at Exh. F through I.*

25.     Again, Liddle makes the ridiculous claim that Counsel Financial "squelched" Liddle's attempts to obtain replacement financing that would have paid off the Counsel Financial loans "in full." *Id. at 27.*  Notably, Liddle goes on to qualify such statement and admits that his supposed take out financing may not have been exactly that, in that Counsel Financial may only have been paid off "in part." *Id.*  He also leaves out the fact that this <u>partial</u> take out financing would have also required Counsel Financial to agree to a significant discount and also surrender its collateral without being paid in full.

26.     Without any supporting documents or other corroborating evidence, such as sworn statements by a third party, Liddle makes the unfounded claim, that a purported loan by Esquire Bank, "would have taken out the CFII and LIG loans in full," that "[a]t the eleventh hour, I was informed that Counsel Financial … killed the deal." *Id. at 28.* Liddle's theory that, rather than being paid off on a loan in default, Counsel Financial preferred "to transfer Liddle & Robinson's cases to Milberg," defies common sense.  Nothing would have made Counsel Financial happier than to have its loans repaid.

27.     Liddle's unsupported statements about Counsel Financial trying "to induce" him to combine his firm with Milberg and counseling L&R "to default on its lease," *id at 29-30,* is absolutely false and yet another piece of revisionist history. Furthermore, Counsel Financial could not have exercised too much power because Liddle's firm was represented at that time by Les Corwin, Esq., a very experienced and well-known attorney, and a partner at Blank Rome, a

very prestigious firm. Mr. Corwin was directly involved and participated in all discussions involving a possible merger of L&R with Milberg, as well as discussions with L&R's landlord which Mr. Corwin spearheaded.[4] *Wander Dec., ¶9.*

28. Similarly, Liddle's unsupported statements about Counsel Financial "thwarting of a critical restructuring transaction with Pierce Bainbridge," (*id. at ¶¶ 35-40*), is false, as evidenced by documentary evidence, specifically, an email dated March 13, 2019, from Carolynn Beck, Esq., a partner at Pierce Bainbridge, to Liddle, who explained that Pierce Bainbridge had rejected Liddle's counter-offer:

> After further analysis and investigation into your cases, Pierce Bainbridge has decided not to enter into a business or employment relationship with you. <u>To be clear, this decision was made by Pierce Bainbridge alone, based on, among other things, our evaluation of your contingency cases and whether it would make business sense for the firm to take such cases.</u>
>
> As you are no doubt aware, we do not currently have any outstanding offers to you. We respectfully decline your counter-offer, which Rose Reverendo emailed to John Pierce on your behalf on March 5, 2019 as a "draft Memorandum of understanding." To the extent you contend any offers are outstanding, a view with which we respectfully disagree, they are now formally rescinded and/or voided. In any event, our prior offer was expressly contingent on reaching agreement on your existing contingency cases, an event which did not come to pass. (emphasis supplied)

*Wander Dec., Exh. D.*[5]

---

[4] Notably, Liddle listed claims against Mr. Corwin and Blank Rome in the Debtor's schedules of assets.

[5] Liddle, apparently, overplayed his hand in negotiating with Pierce Bainbridge and he has no one but himself to blame for this failed "restructuring transaction." This is but another example of Liddle blaming others for his own failings; Liddle merging his practice with Pierce Bainbridge, a well-known national firm, would have been good news and a relief for Counsel Financial.

29.     Liddle's unsupported, self-serving statements about Counsel Financial's alleged

interference with contractual relations, (*id at ¶¶41-46*), are also undercut by applicable law and

documentary evidence.  First, any communications Counsel Financial had with L&R's clients,

"directing them to send all remittances due to Liddle & Robinson" to Counsel Financial, (*id. at*

*41*), were done through counsel pursuant to applicable laws relating to judgment enforcement.

*See Hutcher Dec.,* ¶¶3-7.  These communications were also authorized by the loan documents.

*Declaration by Allen Wilen, case no. 19-12346, doc. 163-3 (the "Wilen Dec."),* ¶11.

30.     Regarding the alleged "diversion of the *Passaretta* fees," id. at 42, whatever

Liddle is complaining about was done with his express written consent.  Specifically, Liddle

signed a stipulation, both on behalf of L&R and individually, authorizing the application of the

Passaretta fee as follows: (i) $425,000 to pay down the CFII loan; and (ii) $506,371.60 to pay

down the LIG loan. In addition, Holdings agreed to increase by $775,000 the availability of the

line of credit it provided to L&R, of which (i) $350,000 would be advanced directly to L&R and

(ii) $425,000 to further pay down the LIG loan. *Wander Dec., Exh. E.*

31.     Moreover, Liddle's statement that Counsel Financial "squelched" his efforts to get

litigation funding from Parabellum LLC., *id. at ¶ 44* ("The Counsel Financial Entities thwarted

that deal through their connections in the litigation funding industry."), is patently false and

unsupported. Counsel Financial has absolutely no connection to Parabellum and has never even

spoken to anyone associated with this entity. Similarly, Liddle's comment about Counsel

Financial interfering with a case being coordinated with a former partner of L&R, James

Hubbard, Esq., and making it "impossible for Liddle & Robinson to stay informed as to the

case," (*id. at 45*), is likewise patently false and unsupported.

32.     Liddle's contention that Counsel Financial's loans are usurious has already been litigated and rejected in the State Court Action when he raised this as an affirmative defense. Thus, Liddle is precluded from even raising this issue on the grounds of res judicata, id. at ¶¶47-50.  Also, this claim is simply not true.  In fact, Counsel Financial has been making similar loans to countless law firms throughout the State of New York and United States over the last 20 years. On the rare occasion when a firm has defaulted and Counsel Financial sought judicial intervention to enforce its rights, each and every time a court has upheld these loans, even when other debtors raised usury as a defense. *See Wander Dec., ¶10.*

33.     Liddle's statements about abusive collection tactics are neither true nor relevant to the motions before the Court.  *See e.g. Wander Dec. at ¶ 11* ("After Liddle's deposition, I sent an email to Liddle's bankruptcy counsel imploring him to focus on settlement discussions, instead of litigation, because a chapter 7 conversion would be awful for Liddle and his family, who would likely be sued by a chapter 7 trustee because of various, improper transfers Liddle made to them and others on their behalf."). Liddle, however, took my statements out of context to portray a false reality, and accuse me of threatening his family. In sum, there is no competent evidence supporting Liddle's outlandish claims and false accusations.

**Response to Declaration of Allen Wilen**

34. Wilen's conclusion (*Wilen Dec. at ¶ 4*), that "the relationship between the Counsel Financial entities and the Firm is more akin to an investment and loan-to-own relationship than a lending relationship", appears to be based upon a limited review of relevant documents and Liddle's unsupported, self-serving statements that have no relationship to actual facts and the loan documents. His unfounded contention that "[t]he three Counsel Financial entities are <u>investors</u> in the Firm pursuant to three Notes," id. at ¶ 5 (emphasis added), also bears no relationship to the loan documents.

35. While Wilen may claim to "understand" that the $775,000 increase in the Holdings line of credit "was neither requested nor authorized by the Firm" and that "there is no documentation whereby the maximum principal amount was increased by $775,000," id at ¶ 7, his understanding is simply wrong, as shown by documentary evidence consisting of the Passaretta Stipulation. As discussed above, the Passaretta Stipulation provided that "Borrower agrees that Holdings shall increase the availability of the line of credit owed by the Borrower to Holdings … by $775,000." *Wander Dec., Exh. E.*

36. Wilens "understanding" about other "intra-Counsel Financial transfers" not being requested or authorized, (*id. at ¶ 8*), also is simply wrong and undercut by documentary evidence. Liddle approved in writing every loan and the manner in which the loan funds were applied. *See Declaration of Megan Payne, Exhs. F-I.*

37. Prior to the Debtors' submission of their opposition papers, Counsel Financial provided Debtors' counsel with detailed calculations for all three loans at issue, showing each advance under the loan facilities and how the funds were applied, each repayment, the calculation

of interest, and details regarding any additional expenses, fees and charges. *See Payne Dec., Ex. 1.* Apparently, Wilen decided to ignore these calculations as well as the loan documents, and, instead, rely on Liddle's self-serving statements and "memoranda prepared by the Debtors." *Id. at ¶ 3.*

38.     More than $7.5 million was advanced directly to L&R as follows: (i) CFII Loan - $6,317,054; (ii) LIG Loan - $520,170; and (iii) Holdings Loan - $725,000. The fact that $3.4 million was paid to Signature Bank and $1.1 million for Liddle's tax debts does not mean the funds were not loaned to L&R. Thus, Wilen's statement that "very little was actually funded to the Firm to finance its operating expenses," id. at ¶ 9 (emphasis added), is misleading at best. The simple fact that Liddle used a significant amount of the Counsel Financial loan proceeds to pay off his existing lender and his tax debts does not, magically, transform the loans to equity investments.

39.     Wilen's statement that "certain client fees were paid directly to LIG without authorization from the Debtors" and that "[t]he Debtors had no input with regard to the application of the fees," id. at ¶ 11, is based upon incomplete information and documentation given to him by Liddle, see e.g. id. ("Instead, as I understand from Mr. Liddle…"). Liddle failed to provide Wilen with the Passarretta Stipulation and other key loan documents, such as the checklists for the Holdings loan and the LIG loan. *See Declaration of Megan Payne (the "Payne Declaration"), Exhs. F and H.* Similarly, Wilen's statement that "[t]ogether, LIG and CF Holdings made a total of approximately $1.5 million in unauthorized advances under the LIG Note and CF Holdings Note," id at ¶ 14, is pure fabrication on his part. Liddle signed off, in writing, on every loan advance. *See, e.g., Payne Declaration, Exhs. F and H.*

40.     Wilen's statement that Counsel Financial's loan documents "are absent many indicia of traditional lending arrangements," (*id. at 16*), indicates that he has not reviewed most of the loan documents.  *See Payne Dec., Exhs. E-H.*  Moreover, Wilen's statement that "[i]t appears that this is an attempt to get around the absolute priority rule, and at worst a Ponzi-like scheme whose claims should be equitably subordinated to the Firm's other creditors," lacks any legal or factual support.

41.     Wilen's statements about interest charged under the Notes are fundamentally flawed and should be rejected by the Court, because he cherry picks what he concludes are "authorized advances," (*Wilen Dec. at ¶ 17*), and "unauthorized principal draws." (*id. at 18*).  Of course, if you back out these numbers you may obtain ridiculously high interest rates such as Wilen has done.  *Id. at 17* ("annualilized rate of 148.71% in February 2019.").

42.     Wilen's comments about Liddle's monthly income of $15,000, which is characterized as a "draw," conflates accounting and tax principles with simple cash flow. According to Wilen, it is a "fundamental accounting premise that a draw is not, by definition, income. Rather, it is an advance against Mr. Liddle's capital account with the Firm."  Id. at 19. Regardless, Liddle is only going to receive $15,000 a month from L&R, whatever those funds are called, and that is much less than Liddle's monthly expenses, even without him making any mortgage payments on the Hampton's mansion.

43.     Further, there is no evidence of any effort "to market and sell the Hamptons properties."  MOL at 40.  The Debtor refused to rent or sell the Hamptons properties during the summer of 2019 and had his daughter live there.  No real estate broker has even been retained.

**Sufficient cause exists to convert both cases to chapter 7**

44.     The fact that L&R is, finally, collecting some fees from its cases is very good news, especially for Counsel Financial.  However, Liddle has yet to contend that L&R will collect enough fees to pay off Counsel Financial in full.  Thus, whether L&R's cash collections in a given month are higher than projected, or the firm's expenses are less than projected, until Liddle values L&R's cases, as of the commencement of its chapter 11 case, at more than $9 million, it is doubtful that L&R has any chance to confirm a plan.

45.     While many of Liddle's creditors may overlap with his firm's creditors, there will be no funds from the firm to pay them, under a plan, because Counsel Financial has a lien on all of L&R's assets and Liddle has not claimed such assets are worth more than $9 million, the amount of Counsel Financial's secured debt.  Since "the Firm's business is the source of effectively all of Mr. Liddle's personal income," (*MOL at 4*), there can be no "financial underpinning for distributions to creditors in both the Individual Debtor case as well as this Chapter 11 case."  *Id.*  Thus, there is no chance for an effective reorganization in Liddle's bankruptcy, nor any chance of a distribution to creditors in L&R's chapter 11.

46.     While Liddle tries to defend against conversion, by citing Collier on Bankruptcy for the proposition that, "[a]s a general rule, if continuing a particular chapter 11 case would promote the twin goals of preserving viable businesses and maximizing the creditors' return, then the case is probably not a candidate for conversion, (*MOL at ¶ 24*), here there is no business to preserve.  Undeniably, L&R must wind down and dissolve as mandated by controlling state law.  Nor will creditors' returns be maximized by keeping this case in chapter 11; all that is accomplished is more administrative expense.    L&R's chapter 11 case is, clearly,

administratively insolvent, and Liddle's individual case will also be insolvent if it remains in chapter 11.

47.     Somehow the Debtor believes his monthly take home income soon is going to dramatically increase above the $15,000 a month he currently receives with Counsel Financial's consent.  He is quite mistaken, though, because all of the funds to pay the Debtor's monthly expenses, except for social security, come from Counsel Financial's cash collateral.  Also, in a wind-down mode, there would be no reason for the Debtor's monthly compensation to be increased.

48.     The award for fuzzy math must go to the Debtor, when he annualizes the $3.5 million in receipts L&R expects to receive in the fourth quarter to "amount[] to $15 million on an annual basis, which rivals some of the Firm's most profitable years."  MOL at ¶ 39.  What business takes its best quarter and uses that for annual projections?  Given that its now the end of the year, the Debtor's gross revenue for 2019 can be easily determined, but for the last 10 days of the year.

49.     Upon information and belief, Liddle has finished most of L&R's lucrative contingency cases and there are few remaining cases that have the potential of generating large fees.  Liddle has provided no details about L&R's current cases, including expected fee revenue, because the prospects are somewhat bleak.

**THERE IS NO BASIS TO RECHARACTERIZE COUNSEL
FINANCIAL'S DEBTS TO EQUITY**

50.     While no motion to recharacterize Counsel Financial's debts to equity has even been filed, let alone decided in the Debtor's favor, the Debtor's objection to conversion to chapter 7 argues that the Debtor can file a confirmable plan, providing a significant distribution

even assuming this Court wants to address this issue at this time rather than in a formal motion it is clear that to the creditors other than Counsel Financial, by recharacterizing Counsel Financial's debts to equity. The Debtor's position is meritless. Simply put, the Debtor has failed to make any real showing that it can meet the necessary elements with admissible evidence.

51.     In deciding whether to recharacterize alleged debt as equity, courts consider the facts and circumstances surrounding the transaction as well as the following factors: (1) names given to instruments, if any, evidencing alleged indebtedness; (2) presence or absence of fixed maturity date and schedule of payments; (3) presence or absence of fixed rate of interest and interest payments; (4) source of repayments; (5) adequacy or inadequacy of debtor's capitalization; (6) identity of interest between creditor and stockholder; (7) security, if any, for advances; (8) corporate debtor's ability to obtain financing from outside lending institutions; (9) extent to which advances were subordinated to claims of outside creditors; (10) extent to which advances were used to acquire capital assets; and (11) presence or absence of sinking fund to provide repayments. In re: Aéropostale, Inc., 555 B.R. 369 (Bankr. S.D.N.Y. 2016) (quoting In re AutoStyle Plastics, Inc., 269 F.3d 726, 750 (6th Cir. 2001)).

52.     While "no one factor is controlling or decisive ... the court may dismiss a recharacterization claim if the plaintiff fails to plead facts that trigger the applicability of the AutoStyle factors, or a meaningful subset of them." BH S & B Holdings, 420 B.R. at 157–58 (internal citations omitted).

53.     Here, the Debtor's recharacterization claim should be rejected outright since none of the relevant factors weigh in favor of recharacterization.

## Names given to instruments evidence indebtedness

54.     First, the names given to the loan documents clearly evidence indebtedness, e.g. "$1,000,000 Revolving Loan to Liddle & Robinson," "Revolving Promissory Note," "Term Promissory Note," "$1,000,000 Term Loan," and "$1,000,000 Revolving Loan." Accordingly, the first factor weighs firmly against recharacterization. *See In re: Aéropostale, Inc.*, 555 B.R. 369, 421 (Bankr. S.D.N.Y. 2016) ("As for the first factor—the names given to the instruments— the Tranche B facility was documented as a loan."); *BH S & B Holdings LLC*, 420 B.R. at 158 (holding that loan documents entitled "Subordinated Second Lien Financing Agreement" weighed against recharacterization); *In re Sabine Oil & Gas Corp.*, 547 B.R. 503, 567 (Bankr. S.D.N.Y.), *aff'd*, 562 B.R. 211 (S.D.N.Y. 2016) (finding that a loan documented as a "Second Lien Loan" weighted against recharacterization).

## There are fixed maturity dates and schedules of payments

55.     Second the loan documents provide for maturity dates and payment schedules. For example, the CFII Note provides for the outstanding principal amount to be repaid in twenty-four consecutive monthly payments with the final payment due and payable on July 1, 2020. CFII Note, Section 2(a). Accordingly, the second factor weighs against recharacterization. *Aéropostale*, 555 B.R. at 421 (holding that the presence of a fixed maturity date and repayment schedule weighed against recharacterization); *BH S & B Holdings LLC*, 420 B.R. at 158-159 (holding that the presence of a fixed maturity date on the loan weighed against recharacterization); Sabine Oil & Gas Corp., 547 B.R. 503, 567 (Bankr. S.D.N.Y.), aff'd, 562 B.R. 211 (S.D.N.Y. 2016) (holding that a loan with a fixed maturity date and schedule of payments weighed against recharacterization).

**Interest rates and interest payments**

56.     Third, the loan documents have interest rates typical of commercial loans.  See Payne Dec., Exh. E.  See e.g. BH S & B Holdings LLC, 420 B.R. at 159 (holding that a fixed rate of 15% interest capitalized on the first of the month weighed against recharacterization); In re Sabine Oil & Gas Corp., 547 B.R. 503, 567 (Bankr. S.D.N.Y.), aff'd, 562 B.R. 211 (S.D.N.Y. 2016) (holding that a fixed interest rate weighed against recharacterization). Accordingly, this factor weighs against recharacterization.

**Source of repayments**

57.     Fourth, CFII, LIG, and Holdings each received a lien on all of the Debtor's assets. Accordingly, Counsel Financial was not dependent on the overall success of the Debtor's business. *See In re: Aéropostale, Inc.*, 555 B.R. 369, 421 (Bankr. S.D.N.Y. 2016) (finding that a loan fully secured by a lien on all of the Debtor's assets was not dependent on the success of the Debtors' business, which weighed against recharacterization). Accordingly, this factor weighs against recharacterization.

**Adequacy or inadequacy of debtor's capitalization**

58.     The fifth factor had been deemed the least relevant factor because most businesses in bankruptcy suffered from some degree of undercapitalization.  The burden is on the debtor to plead undercapitalization at the time of the loan. In re BH S & B Holdings LLC, 420 B.R. 112, 159 (Bankr. S.D.N.Y. 2009), aff'd as modified, 807 F. Supp. 2d 199 (S.D.N.Y. 2011).  Here, the Debtor has alleged it was undercapitalized when the Counsel Financial loans were made; however, no admissible evidence has been provided.

**No identity of interest between Counsel Financial and Debtor's ownership**

59.     The sixth factor clearly militates against recharacterization, because Counsel Financial had no ownership interest in the Debtor and there was no unity of interest between Counsel Financial and Liddle, the sole equity holder of the Debtor. *See In re: Aéropostale, Inc.*, 555 B.R. at 422 (finding no identity of interest where the creditor did not own any equity in the Debtors); *In re Sabine,* 547 B.R. at 567 (finding that the lender and the borrower were not united in their interests but in fact had an arm's-length relationship where lender did not make a loan in proportion to its ownership interest); *In re BH*, 420 B.R. at 159 (finding that the movant did not meet its burden to show an identity of interest between the creditors and the Debtor).

**The Counsel Financial loans were all secured**

60.     The seventh factor heavily weighs against recharacterization, because all of the Counsel Financial loans were secured by a blanket lien on all of the Debtor's assets. *In re: Aéropostale, Inc.*, 555 B.R. at 422 (holding that a loan secured by liens on substantially all of the Debtors' assets weighed against recharacterization); *In re BH*, 420 B.R. at 159 (holding that a loan secured by, among other things, Accounts, Books, Inventory, money, and Cash and Cash equivalents was a strong indication of indebtedness).

**Corporate debtor's ability to obtain financing from outside lending institutions;**

61.     The eighth factor weighs against recharacterization, because the Debtor admittedly sought outside financing, including Signature Bank, Esquire Bank and Parabellum. The burden is on the movant to show that the Debtor could not receive financing from outside lending institutions. *In re BH*, 420 B.R. 112, 160 *In re: Aéropostale, Inc.*, 555 B.R. at 422 (where

the Debtors sought out proposals for financing and in fact received financing proposals from other potential lenders, the court found that this factor weighed against recharacterization).

**Counsel Financial's advances were not subordinated to claims of outside creditors**

62.     It cannot be disputed that Counsel Financial's advances were not subordinated to any other creditors.  Accordingly, this ninth factor weighs against recharacterization.  *In re: Aéropostale, Inc.*, 555 B.R. 369, 422 (the debt was structured to be senior to the majority of claims against the Debtors, except for the pre-petition asset-based lenders); *In re BH*, 420 B.R. 112, 160 (finding that a loan that was junior to one loan but senior to other loans should not be recharacterized).

**Counsel Financial's advances were not used to acquire capital assets**

63.     The tenth factor clearly weighs against recharacterization, because Counsel Financial's advances were not used to acquire capital assets.  *In re: Aéropostale, Inc.*, 555 B.R. 369, 422 (factor weighed against recharacterization where the loan stated that the proceeds "shall be used solely for working capital and general corporate purposes of the Borrower."); *In re BH*, 420 B.R. 112, 160 (factor weighed against recharacterization where the debtor used the proceeds to purchase inventory and to maintain cash reserves).

**No sinking fund to provide repayments**

64.     The final factor is irrelevant, because Counsel Financial is secured by liens on all of the Debtor's assets.  See In re: Aéropostale, Inc., 555 B.R. 369, 422 (finding that the sinking fund factor was irrelevant to the analysis where the creditor was secured by liens on substantially all of the debtor's assets).

65.     As shown above, all of the applicable factors either weigh against recharacterization or are neutral, except for one factor (i.e. undercapitalization) which has not been proven by the Debtor.

66.     Thus, if this Court even wants to consider this claim, it is certainly meritless.

### CONCLUSION

67.     Liddle has abjectly failed to raise either a legal or factual basis to deny Movant's motion.  On the factual side, Liddle's efforts to cast Counsel Financial in a negative light to afford him a tactical advantage in this litigation has not succeeded.  Counsel Financial, through documentary evidence and sworn affidavits, has demonstrated there is no substance to any of Liddle's allegations.  Insofar as it is relevant, Counsel Financial has at all times acted in good faith and it is doing nothing more than what any prudent lender would do, which is to enforce its rights.

68.     For all of the reasons set forth herein, Counsel Financial's motions should be granted in their entirety.  Both cases should be converted to chapter 7.

Dated: New York, New York
         December 17, 2019

                              DAVIDOFF HUTCHER & CITRON LLP

                              By: /s/ David H. Wander
                                    David H. Wander
                                    Alexander R. Tiktin
                              605 Third Avenue
                              New York, New York 10158
                              (212) 557-7200
                              dhw@dhclegal.com
                              art@dhclegal.com

                              *Attorneys for Counsel Financial II LLC,*
                              *LIG Capital LLC, and Counsel Financial Holdings LLC*